## Simon Election Case.

Argued January 9, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Gerald G. Dolphin,* for appellant.

*Stanley F. Coar,* with him *Sidney Grabowski,* for appellees.

OPINION BY MR. CHIEF JUSTICE MAXEY, March 25, 1946:

At the general election held in Lackawanna County on November 6th, 1945, the Republican candidate for Recorder of Deeds, Clair M. Simon, was, before the so-called "military ballots" were counted, credited with 47,455 votes and his Democratic opponent, Frank M. Bonin, with 46,828 votes. After the "military ballots" were counted, the vote stood Simon 48,287 and Bonin

49,007 votes. Because of certain alleged irregularities in the counting of the "military ballots", Simon requested the County Board of Election to discard all such ballots. This request was rejected. An appeal was taken to the Court of Common Pleas of Lackawanna County and after argument, the appeal was dismissed. The appeal of this case followed.

Certain provisions of the Election Code regulating the counting of the votes cast by persons in military service as set forth in the Act of March 9, 1945 [1] were not observed by the Lackawanna County Board of Elections.

First, The Board failed to compare the information contained in the affidavit and jurat on the military envelopes during the canvass with the information contained in the military list or file as required by Section 10 of the Act.[2]

The finding of the lower court that the Board had complied with the Act was not warranted. The court below erred in holding that a mere *examination* of the affidavit and jurat on the military envelope was a sufficient compliance with the Act. The most important requirement is the *comparison* of the information on the envelope with the "military list". This comparison is essential (1) to the identification of the military elector as a qualified voter of the county and election district

---

[1] Act of March 9, 1945, P. L. 29, Section 10; 25 P.S. Sec. 3138 et seq.

[2] Section 10, 25 P.S. Sec. 3144—"In disposing of an official military ballot the county return board or the county board of election shall examine the affidavit and jurat and if the jurat bears a date later than the date of the election, the envelope shall be set aside unopened. The board shall then *further* examine the affidavit and jurat of each envelope not so set aside and shall compare the information thereon with that contained in the military file. *If the board is satisfied that the affidavit and jurat are sufficient and that the elector has qualified, and the board has utilized the information contained in the military file to verify his right to vote,* the board shall announce the name of the elector and shall give any person present an opportunity to challenge . . ." (Italics supplied.)

and, (2) to the prevention of "repetitive", that is, double. or multiple voting. The record shows that although the Board examined the form and sufficiency of the affidavit and jurat on the military envelopes and cast aside the deficient ones, it did not go *further*, as the Act requires, and compare the affidavit and jurat on the envelopes *not* set aside with the information contained in the military file. That this latter duty was not performed is clearly evidenced by the testimony of two of the three commissioners who functioned as the Board of Elections. William Geiger stated that out of about 31 or 32 hundred "military ballots" received he compared "about 50 or 60"; he acknowledged that the law required him as a member of the board to compare every "military ballot" with the military list. Moreover, Mr. Geiger did not know whether or not the information on the military envelope was ever compared with the military list, with the exception of about 50 which he personally examined. Also, later Mr. Geiger testified that previous to the canvass of the military ballots, the Board did not compare "military ballots" received with the military list to ascertain duplicates or multiple voting by the same military elector, and during the canvass no comparison was made with the list. The only precaution taken was the announcement of the elector's name on the military envelope after examining the affidavit and the jurat thereon. The second member of the Lackawanna Board of Elections, George Bonner, testified that he did not compare the information on the military envelopes with the information in the military file and he did not know whether the county board made such a comparison. He further stated that the only duty assigned to him was upon the receipt of a military envelope to record the name of the military elector and, in some instances, his voting municipality and then to file the envelopes. He stated that he did no comparing.

Second, The Board of Elections failed to arrange and post lists of military electors alphabetically *by election*

*districts,* as required by the Act.[3] Three general lists were prepared, each arranged alphabetically as to the first letter of the surname only.

Third, The Board failed to post a complete "Military List" five days before the election, as required by the Act.[4]

Fourth, The County Board failed to make the ballots, military files, and applications for such ballots public records, as required by the Act.[5] Such information and documents are to be public records for a period of two years. The lower court erred when it stated: "We also find no requirement in the military election act necessitating the Board to produce at the canvass of the vote, the applications filed requesting the issuance of the military ballots." Mr. Geiger in his testimony stated that as a member of the Lackawanna Board he did not make the military applications available to counsel for the Republican candidates and said he did not believe that the law required the applications to be public records. The Act says they *are* "public records (except to the extent expressly forbidden by the War Department)". Public records are available to the inspection of any citizen at all reasonable times. These public records should have been available to stand the test of

---

[3] Section 10, 25 P.S. Sec. 3142 "Each county board of election shall post in a conspicuous public place at its office a master list, arranged alphabetically by election districts, setting forth the name, residence, and the local voting district or ward of every elector to whom an official military ballot has been sent . . ."

[4] Section 10, 25 P.S. Sec. 3142 "This list shall be known as the 'Military File' and shall be posted at least five days before the election day involved, and shall also set forth the total number of such ballots prepared for use in such election . . ."

[5] Section 10, 25 P.S. Sec. 3145 "All official military ballots, military files, applications for such ballots and envelopes on which the jurats and affidavits appear, and all information and lists are hereby designated and declared to be public records and shall be safely kept for a period of two years, except that no information shall be made public which is expressly forbidden by the War Department because of military security."

scrutiny by any party in interest. In that way fraud, if it exists in respect to those records, is disclosed. Mr. Geiger testified: "I don't know of any former servicemen who applied after their discharge for military ballots, but I imagine there were some." He admitted that he took no steps to identify a serviceman who appeared in person for a military ballot and had no knowledge of whether his clerks did so or not.

The failure of the County Board of Elections to comply with the plain requirements of the statute in examining and computing the military ballots is condemned. The Commonwealth expects that all officials charged with the duty of guarding and computing the votes of qualified electors will obey the letter and spirit of the applicable law in respect to that duty; only by such obedience to the law will the possibility of fraud be reduced to a minimum.

The question of whether or not this entire military poll shall be rejected because of the irregularities specified and proved is analogous to the question which has often been before the courts as to whether the entire poll of an election district shall be rejected because of irregularities on the part of officers conducting the election and making the electoral count. The courts have never been able to lay down a precise standard by which it can be determined in a given case whether the irregularities are of sufficient magnitude to justify the rejection of an entire poll in any district in which the question arises. The facts in each case must be considered and a determination reached as to whether justice is more likely to be done by counting the votes, despite the irregularities, or by refusing to count them because of the irregularities. In *West Mahanoy Township's Contested Election*, 258 Pa. 176, 179, Chief Justice BROWN, speaking for this court said: "For mere irregularities in conducting an election it is not to be held void, even though the election officers may be subject to punishment for misconduct. This is so because the rights of voters are not to be prejudiced by the errors or

wrongful acts of the officers of the election, unless it appears that a fair election and honest count were prevented: *Krickbaum's Contested Election,* 221 Pa. 521. Nor is the mere casting of fraudulent votes sufficient to throw out the return from an election district." This court expressed a like opinion of the effects of election irregularities in *Twenty-Eighth Congressional District Nomination,* 268 Pa. 313, and in *Focht's Appeal,* 275 Pa. 449. In the *Contested Election of Edwin R. Wheelock,* 82 Pa. 297-299, the action of the lower court in refusing to set aside the entire poll in an election district was sustained by this court on grounds which we said were "sufficiently stated in the opinion of the lower court." The lower court said: "An election is the embodiment of the popular will, the expression of the sovereign power of the people. When the application of technical rules and a strict construction of the acts of the officers, in preparing the election papers and conducting an election, would tend to defeat the will of the people and change the result of an election for an important office, they should not be applied, and all reasonable intendments should be made in favor of the legality of their proceedings. When, however, it is alleged that there is actual fraud in the election, or that the ballot-box has been tampered with, or illegal votes received, or the careless or fraudulent acts of the officers have mixed and confused the ballots, the duty of the court is equally plain, and every legal facility should be afforded to purge the poll; and when the acts of the officers are so fraudulent and irregular that the *result cannot be ascertained,* then the entire poll is rejected." In *Fish's Election,* 273 Pa. 410, this court said: p. 417, "Moreover, to eliminate an entire poll, though no harm has actually been done, merely because public officials did not perform their duty properly, would result in the very wrong sought to be prevented; for if they are unscrupulous (knowing, as they always do, where votes antagonistic to their desires will be cast), they can

wrongly fit up the election room and booths in every district which they desire shall be thrown out, and thus indefinitely control elections, even for their successors, pledged in advance to repeat the wrong." In *Strong, Petitioner,* 20 Pick. (Mass.) 484, the highest judicial court in Massachusetts said: "For a wilful neglect of duty the officers would undoubtedly be liable to punishment. But shall the whole town be disfranchised, by reason of the fraud or negligence of their officers? This would be punishing the innocent for the fraud of the guilty. It would be more just and more consonant to the genius and spirit of our institutions, to inflict severe penalties upon the misconduct . . . of the officers, but to receive the votes whenever they can be ascertained with reasonable certainty. If no return, or an imperfect one be received let it be supplied or corrected by a reference to the original record, if any there be." The dominant rule is to give such a construction to the official acts of municipal officers as will best comport with the meaning and intention of the parties as derived from a fair and honest interpretation of the language used, and to sustain rather than to defeat the will of the people, and thus disfranchise the citizen. In Paine on Election, Sec. 585, appears the following: "An election will not be invalidated by mere neglect or irregularity, on the part of the officers, in making up the returns if the will of the voters, legally expressed, can be ascertained with certainty."

In the case now under review, no fraud was alleged or proved. Irregularities *were* disclosed and these might have facilitated the commission of fraud if fraud had been planned. But fraud cannot be proved by merely showing fraud-facilitating circumstances. "Where acts are of an official nature . . . a presumption arises in favor of their due execution. . . . It is a maxim of the law . . . to presume that what has been done was done of right, and not of wrong. . . . The law will presume in favour of honesty and against fraud", (citing cases) Broom's *"Legal Maxims"*, 10th edition, p. 640 et seq.

It is a serious matter to reject 3,011 ballots of voters who at the time they marked their ballots were militarily serving their country. No court will order such a wholesale rejection of "military ballots" unless stronger reasons for doing so are presented than are presented in this record. Neither an individual voter nor a group of voters can be justly disfranchised "except for compelling reasons", as this court said in *Bauman Election Contest Case*, 351 Pa. 451. The "reasons" offered for the disfranchisement at the November 1945 Municipal Election, of 3,011 Lackawanna County voters then in their country's armed forces, do not measure up to the "compelling" requirement.

The order is affirmed.