THE STATE OF DELAWARE, Upon the Relation of Robert H. Wahl, v. CHARLES S. RICHARDS, Chief Justice of the State of Delaware, and CALEB R. LAYTON, III, Associate Judge of the State of Delaware, Resident in New Castle County, Constituting the Superior Court of Delaware, in and for New Castle County, pursuant to Section 6 of Article V of The Constitution of The State of Delaware, and as such the Board of Canvass in and for New Castle County, State of Delaware, and ROBERT L. ARMSTRONG, Intervening Defendant.

(*February* 25, 1949.)

HARRINGTON, Chancellor, TERRY, CAREY and PEARSON, J. J., sitting.

*E. Ennalls Berl, William E. Taylor, Jr., James L. Latchum* and *Michael A. Poppiti* for the relator.

*Henry M. Canby, William S. Satterthwaite, Louis J. Finger* and *John S. Walker* for the intervening defendant.

*John P. Sinclair* was permitted to appear as amicus curiae for the purpose of suggesting that the relator's petition be dismissed on jurisdictional ground which will be discussed later.

Supreme Court, No. 10, November Session, 1948.

HARRINGTON, Chancellor, delivering the majority opinion of the Court:

Robert H. Wahl and Robert L. Armstrong were the duly nominated and opposing candidates of the major political parties for the office of Representative in the General Assembly from the Second Representative District in New Castle County at the General Election held November 2,

1948. After canvassing the votes cast in the various election districts of the Second Representative District, the Judges of the Superior Court, sitting as the Board of Canvass for New Castle County, issued certificates showing that Robert L. Armstrong had received a plurality of such votes. Robert H. Wahl, the relator, questions the legality of the count in the Third Election District of the Sixth Ward in the Second Representative District of the county, and seeks a writ of mandamus directing the said Judges of the Superior Court, sitting as the Board of Canvass (1) to reconvene the said court and to recanvass the vote for the office of Representative in the General Assembly from the Second Representative District for New Castle County, and particularly in the Third Election District of the Sixth Ward; (2) that, in making such recount, they reject all of the ballots cast for the office of Representative in the General Assembly in the Third Election District of the Sixth Ward in the Second Representative District of the county on the ground that they were tainted with illegality because 101 of the 296 ballots voted in that district were in envelopes not signed by both clerks; and (3) that if it should then appear that Robert H. Wahl had received a plurality of all of the votes cast for the said office of Representative in the General Assembly from the Second Representative District in New Castle County, that the certificates issued showing the election of Robert L. Armstrong should be cancelled and new certificates issued accordingly.

The relator claims that Robert L. Armstrong is not a proper party to this proceeding, and that the order permitting him to intervene as a defendant should be revoked. See *Spelling on Extra. Relief* (1893) § 1338; *Woolley's Del. Pract.* § 1658.

Title to the office of Representative in the General Assembly cannot be tried in this proceeding and the

writ, if issued, will only be directed to the Judges of the Superior Court, sitting as the Board of Canvass (*State ex rel. Walker v. Harrington and Terry,* 3 *Terry* 14, 27 *A.* 2d 67); but that does not determine the question. The right to intervene as a party to an action was unknown at common law, but in modern practice a more liberal rule is often applied, though the person seeking to intervene has no real direct interest in the controversy. *Bankers' Mortgage Co. v. Sohland,* 3 *W. W. Harr.* 331, 138 *A.* 361. Apparently, the same rule has been applied in similar mandamus cases, though the intervening defendant could not be required to perform any of the duties contemplated by the petition. *People ex rel. Barbee v. Jarecki,* 247 *Ill. App.* 215.

In *State ex rel. Walker v. Harrington and Terry, supra,* which was also a mandamus case, the attorneys representing one of the candidates for the office of Comptroller for Kent County, voted for at the election, were permitted to appear as amici curiae, but the case does not indicate that there was any application to intervene as a party to the proceeding.

Moreover, Rule 49 of this court provides that when a petition is filed for a writ of mandamus, the cause "* * * shall be heard according to the practice and procedure of similar causes in the Superior Court of this State."

Rule 81 of the Superior Court provides that procedure in case of mandamus "* * * shall conform to these rules so far as practicable and to the extent that this will not contravene any applicable statute; otherwise, the procedure in such matters shall remain as heretofore."

Rule 24 of the Superior Court also provides in part:

"(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action:

* * * (2) when an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

These rules were promulgated after Rule 49 of this court went into effect, but its language seems to indicate that it was not intended to be confined to existing rules of the Superior Court.

■ The intervening defendant has some interest in the result of a recanvass of the vote, if made, and should be permitted to participate in the pleadings and other steps in the case. The relator's motion to strike off the intervention order, is, therefore, denied.

John P. Sinclair, a member of the House of Representatives in the 114th General Assembly of the State of Delaware and duly re-elected a member in the 115th General Assembly, was permitted to appear as amicus curiae in order to suggest that the relator's petition should be dismissed because of the lack of jurisdiction of this court to give the relief sought. His contention is based on Section 8 Article II of the Constitution which provides:

"Each House shall be the judge of the elections, returns and qualifications of its own members;"

Section 12, Article IV of the Constitution also provides:

"The Supreme Court shall have jurisdiction as follows: * * * (5) To issue writs of * * * mandamus to the Superior Court * * * or any of the judges of the said courts * * *."

■ The relief sought under the latter provision is not in conflict with the constitutional powers given the Legislature by Section 8, Article II to determine the election and qualifications of its own members. *People ex rel. Fuller*

*v. Hilliard et al.,* 29 *Ill.* 413; *State v. South Kingstown,* 18 *R. I.* 258, 27 *A.* 599, 22 *L.R.A.* 65; *Ellison v. Barnes,* 23 *Utah* 183, 63 *P.* 899; 107 *A.L.R.* 211.

Wahl does not and could not seek an order directing the House of Representatives to recognize him as a duly elected member of that body from the Second Representative District in New Castle County. He only seeks to require the proper performance by the Board of Canvass of a duty imposed by law (so that he may thereby procure evidence of his election to office), and mandamus is his only remedy. He could not procure the same evidence in a contest for the office in the House of Representatives, pursuant to the method provided by Chapter 64 of the Revised Code of 1935. Should he appear before the House armed with a certificate indicating his election, that body would still have the exclusive right to determine whether he was a duly elected member. *People ex rel. Drake v. Mahaney,* 13 *Mich.* 481; *Petition of Dondero,* 94 *N. H.* 236, 51 *A.2d* 39; *State v. Corley,* 6 *W. W. Harr.* 135, 136, 172 *A.* 415. But the presentation of the certificate would bring the question before the House and would be pertinent evidence for its consideration in determining his rights.

In *People ex rel. Fuller v. Hilliard et al., supra,* which involved a similar proceeding, the court said:

"The House of Representatives has no cognizance whatever of this matter. That body can only take cognizance of the case when the certificate is presented, and a seat claimed in virtue of it.

  \*   \*   \*   \*   \*   \*

"Though the House of Representatives is the sole and exclusive judge of the qualifications of its members, this application has no reference whatever to the point of qualifications. Its sole purpose is to procure the requisite evi-

dence, to present to that body, of a prima facie right to a seat in it, independent wholly of the question of qualification. It is clear, then, the appropriate remedy is not within the House of Representatives. The only remedy the relator has—the only means by which he can obtain evidence of the right claimed, is by this compulsory writ of mandamus."

Applying these principles, we are unable to agree with Mr. Sinclair's contention.

Other jurisdictional defenses relied on by the intervening defendant are:

(1) That a writ of mandamus will not issue to disturb, correct, or override the determination of a question of fact or of law committed to the discretion of the Superior Court in the exercise of judicial or quasi judicial functions even though the decision of the Superior Court was wrong as to the facts or as to the law: and

(2) That such a writ will not issue when there is an adequate remedy at law; and there is a remedy by a writ of error, by a writ of certiorari, or under the provisions of Article I, Chapter 64 of the Revised Code of 1935, relating to contested elections.

All of these defenses are overruled on the authority of the recent decision of this court in *State ex rel. Walker v. Harrington and Terry*, 3 *Terry* 14, 27 *A.* 2d 67. There, a number of soldiers in the United States Army, who were registered voters in this State, but stationed in camp in another State, cast their ballots under the absentee ballot law, and without appearing in person, for a nominee for the office of Comptroller for Kent County. The counting of such ballots was objected to before the Superior Court, sitting as the Board of Canvass, on the ground that the Act under which they were voted violated the provisions of the State Constitution. The court doubted its

power to consider and determine that question, and counted the ballots. The nominee for the office on the Democratic ticket having received a plurality of all the votes cast in the county, a certificate was issued accordingly. On the petition of the defeated candidate, this court subsequently issued a writ of mandamus directing the Judges of the said Superior Court to reconvene, to recanvass the vote for the office of County Comptroller, and to omit therefrom the ballots cast by the absent soldiers. See also *State ex rel. Walker v. Harrington and Terry*, 3 *Terry* (42 *Del.*) 246, 30 *A.*2d 688. This direction was based on the conclusion that the then absentee ballot law, providing for the soldiers' vote, violated the State Constitution and that the Superior Court should have rejected that vote. The same jurisdictional defenses raised here were relied on in that case but were denied.

At the General Election held November 2, 1948, the names of three candidates for the office of Representative in the General Assembly from the Second Representative District in New Castle County appeared on the official ballots, two of whom were nominees of the two major political parties. In the Third Election District of the Sixth Ward 296 ballots were voted for the various candidates for that office; 100 of these were in envelopes not signed by either of the clerks who aided in conducting the election, and one was in an envelope signed by only one clerk. After the close of the polls, the election officers, in order to count the ballots, removed them from their envelopes and placed them in piles on a table in the room where the election had been held. The so-called straight tickets, or the ballots voted for all the candidates on the ticket of any one political party, were placed in separate piles and the cut or split tickets were put in another pile. After the ballots had been removed, the envelopes were also placed in a pile on another table. The election officers in counting the ballots rejected

18 of them on the ground that they were not properly mark-
ed by the voters, and put them in four unsigned envelopes
taken at random from the pile. All other ballots were count-
ed.

There was a dispute before the Superior Court, sitting
as the Board of Canvass, with respect to the result of the
vote in the Third Election District of the Sixth Ward for
the office of Representative in the General Assembly from
the Second Representative District in New Castle County,
and on the proper steps being taken a recount was had.

The 101 ballots contained in envelopes not signed by
both clerks when voted had not been segregated by the elec-
tion officers and the court could not identify them. They re-
jected 97 of such ballots and deducted them pro rata from
the total vote received by each candidate for the office.[1] Of
the 18 ballots which had been rejected by the election of-
ficers, 9 were counted by the court; but it does not appear
whether they had been voted in signed or unsigned en-
velopes.

The Election Law requires:

(1)   That both clerks at any polling place shall "write
their full names in ink in the places designated on the en-
velopes (in which the ballots are to be enclosed when voted),
in their ordinary handwriting, and without any distinguish-
ing mark of any kind." § 1853, Revised Code 1935;

(2)   That no Inspector of Election or other officer act-
ing for him "shall deposit (in the ballot box) any envelope
upon which the names of the Clerks of the Election * * * do
not appear". Section 1854, Revised Code 1935;

(3)   That in counting the votes "any ballot contain-
ed in an envelope which is not endorsed with the names

---

[1] It is unnecessary to consider why the remaining 4 ballots were
not treated in the same way.

of the Clerks of the election as provided in this Chapter * * * shall be void and shall not be counted; * * *." Section 1859, Revised Code 1935.

But Section 1859 also contains the following provision:

"Provided, however, that such ballots and envelopes and all disputed ballots and envelopes shall be preserved by the Inspector and, at the close of the count, placed * * * in the box into which the ballots shall have been put when read."

The purpose of that provision, so far as ballots contained in unsigned envelopes are concerned, is clearly for identification when they are sent to the Superior Court in order that the official canvass may be made, though the precise method to be used in segregating them is not prescribed by the statute. Originally, there was a direction in a subsequent paragraph of the section that in counting the ballots voted, each ballot should be "immediately returned to the envelope from which it is (was) taken, and secured therein by a rubber band." That provision was repealed by *Chapter* 154 § 2, *Volume* 46, *Laws of Delaware;* but its repeal did not affect the general purpose of the proviso of the section.

If the 101 ballots in unsigned envelopes were among those voted for Robert L. Armstrong, their rejection in a recount would change the result of the election for the office of Representative in the General Assembly. Wahl, the relator, claims that as these ballots cannot be separated from the legal ballots cast in the Third Election District of the Sixth Ward, the entire vote of that district should be rejected, and a writ of mandamus issued to that effect. This would result in the rejection of 186 valid ballots, through no fault of the voters. Courts are always reluctant to reject the entire vote of an election district in counting the bal-

lots because of some irregularities committed by election officers unless there is a clear statutory provision requiring it. *Winograd v. Coombs,* 342 *Pa.* 268, 20 *A.*2d 315; *Moyer v. Van De Vanter,* 12 *Wash.* 377, 41 *P.* 60, 29 *L.R.A.* 670, 50 *Am. St. Rep.* 900; 18 *Amer. Jur. (Elections)* § 231; see also *Williams v. Sherwood,* 51 *N. D.* 520, 200 *N. W.* 782. Ordinarily, ignorance, inadvertence, mistake, or even intentional wrong on the part of such officers should not be permitted to disfranchise voters who are innocent of any wrongdoing, if it can be avoided. *McCrary on Elections* §§ 126, 227, 231; *Mehling v. Moorehead,* 133 *Ohio St.* 395, 14 *N. E.* 2d 15.

In *Hamilton v. Marshall,* 41 *Wyo.* 157, 282 *P.* 1058, 1060, 66 *A.L.R.* 1154, the court, quoting from Paine on Elections, said:

"In the total absence of proof tending to show for whom illegal votes, sufficient in number to affect the result, were cast, the duty of the court would seem to be to choose, as wisely as possible, between a disregard of the illegality and a rejection of the entire precinct vote."

See also *Simon Election Case,* 353 *Pa.* 514, 46 *A.* 2d 243. The determination of each case, therefore, depends upon its own facts.

The 101 ballots in envelopes not signed by both clerks, when voted, were illegal and should have been rejected by the election officers in making the count. *Tuthill v. Rendleman,* 387 *Ill.* 321, 56 *N. E.* 2d 375; *Hammond v. Love et al.,* 187 *Md.* 138, 49 *A.*2d 75. As they were not segregated, they could not be identified by the court in canvassing the vote; but that was not due to any acts of the voters. When illegal ballots have been voted in an election district in such numbers as to affect the result, or at least to make it uncertain, and cannot be identified and separated

from the valid ballots, there are cases where justice requires that the entire vote of that election district be rejected in making the count. *Vigil v. Garcia*, 36 *Colo.* 430, 87 *P.* 543; *Neeley v. Farr*, 61 *Colo.* 485, 158 *P.* 458, *Ann. Cas.* 1918*A*, 23; *In re Bright's Contested Election*, 292 *Pa.* 389, 141*A.* 254; 18 *Amer. Jur. Supp. (Elections)* 37; 155 *A.L.R.* 682. This is particularly true when fraud is alleged and proved. Id.

The cases cited by the relator are largely of that character, and no case, even remotely resembling the facts of this case, is cited.

The statutory provisions requiring the use of envelopes signed by both clerks in voting are among many provisions intended to identify the official ballots and to prevent fraud (*Harrington v. Crichton*, 53 *Mont.* 388, 164 *P.* 537; *Slaymaker v. Phillips*, 5 *Wyo.* 453, 40 *P.* 971, 42 *P.* 1049, 47 L.R.A. 842) ; but here fraud is neither alleged nor proved. The allegation in the relator's petition that 101 of the 296 ballots cast in the Third Election District of the Sixth Ward in the Second Representative District in New Castle County were enclosed in envelopes not signed by both clerks does not constitute an allegation of fraud. It is just as consistent with the conclusion that a negligent mistake by the election officers is charged.

Section 1859 of the Election Law does not determine the question. It merely provides for the rejection of illegal ballots, and what steps shall be taken by the election officers to aid the court in making the official canvass. When that and other sections of the statute were enacted, official ballots and the necessary envelopes could only be procured at the polls. So far as the ballots are concerned that rule has been somewhat changed by subsequent legislation; but there has been no change with respect to the envelopes and the mode of identifying them.

Even in the absence of fraud, there may be cases where the possible injury to the public from the failure of election officers to comply with statutory provisions is so great that the entire vote of an election district will be rejected, without any actual proof of improper results from such failure. That rule was applied in *Atty. Gen. ex rel. McCall v. Kirby*, 120 *Mich.* 592, 79 *N. W.* 1009, and in *Tebbe v. Smith*, 108 *Cal.* 101, 41 *P.* 454, 29 *L.R.A.* 673, 49 *Am.St. Rep.* 68. In the Michigan case, the election officers, without any statutory authority, appointed a voter's assistant. In the California case, while the statute provided that the polls should be opened at sunrise, they were not opened by the election officers until 10:00 A. M. But the facts of this case are quite different and do not bring it within that rule. Moreover, the relator's contention in this connection made at the argument was that fraud should be inferred from the statement that nearly one-third of all the ballots cast in the district were illegal. That contention has already been considered.

Wahl and Armstrong were candidates for office on the Democratic and Republican Party tickets respectively, and we will take judicial notice that they were the major political parties in New Castle County at the preceding General Election. Under the statutes, the election officers and clerks in the Third Election District of the Sixth Ward were selected from members of each of these parties. Sections 1765, 1853, 1753, *Revised Code*, 1935; *Vol.* 45 *Laws of Delaware, c.* 144, *p.* 466, § 11 *et seq.*

No suspicious circumstances connected with the violation of the Election Law appear.

It is not claimed that the ballot box contained more ballots than the registration books indicated were voted; that any election officer or clerk protested against the use of unsigned envelopes and the counting of ballots contained

in them, or demanded that such ballots should be segregated when sent to the Superior Court. Nor does it appear that unofficial envelopes were used by any voters. Under the circumstances, the failure of the intervening defendant to produce any evidence explaining the reason for the irregularities committed by the election officers and clerks seems unimportant.

Furthermore Section 1858 of the Revised Code of 1935 provides:

"All ballots cast at any election shall be counted for the persons for whom they were intended, so far as such intention can be ascertained therefrom."

We conclude that all of the ballots from which the intent of the voters could be ascertained should have been counted by the Superior Court. *Cf. Swift v. Registrars of Votes of Quincy*, 281 *Mass*. 271, 183 *N. E.* 730. The application of any other rule would often permit unscrupulous election officers to invalidate elections at will.

As heretofore stated the Board of Canvass applied the proportionate deduction rule. While some courts have adopted that rule we do not regard it as logical or satisfactory under the facts presented.

The prayer of the petitioner is denied.

CAREY and PEARSON, J. J., concur.

TERRY, J., dissents:

My difference with the majority relates only to the manner in which they have passed upon the merits of the case.

The pertinent election statutes involved are as follows:

"1853. Section 44. Ballots and Envelopes; Opening

Packages; Deposit of Ballots in Booths; Delivery of Twenty-Five Envelopes to Clerk; Signing of Envelopes; Delivery to Elector: — At the opening of the election after the qualifications of the several officers and in the presence of the others, the Inspector or the Chairman of the Board of Inspectors shall open the packages of ballots and envelopes in such a manner as to preserve the seals intact. He shall place in each box provided in each booth at least ten ballots, and at all times during the election it shall be his duty to see that at least ten ballots are kept in each box in each booth. He shall then deliver to the Clerk of the Election of the opposite political party from his own twenty-five of the envelopes. The Clerks of the Election shall at once proceed to write their full names in ink in the places designated on the envelopes, in their ordinary handwriting, and without any distinguishing mark of any kind. As each successive elector calls for a ballot and envelope, the Clerks of the Election having the custody of the ballots and envelopes shall deliver to him the first signed of the twenty-five envelopes and one ballot, and the Inspector shall immediately deliver to the said Clerk of the Election another envelope, which the Clerks of Election shall at once sign, as before, and add to the envelopes already signed, so that it shall be delivered for voting after all of those theretofore signed."

"1854. Sec. 45. What Envelopes Not Deposited:— No Inspector of Election, or other officer authorized by law to hold the election, or Judge acting for the Inspector, shall deposit any envelope upon which the names of the Clerks of the Election, as hereinbefore provided for, do not appear, or any envelope on which appears any distinguishing mark, defacement or mutilation; provided, however, that no mark shall be considered distinguishing, and no envelope shall be considered defaced or mutilated, unless it plainly

appears that it was the intention of the voter to so mark, deface or mutilate his envelope."

"1859. Sec. 50. Distinguishing Marks; When Ballots Not Counted; Disputed Envelopes and Ballots How Preserved; Unused Envelopes Destroyed; Counted Ballots and Envelopes How Disposed of; Ballots; How Counted and Disposed of:—In the counting of the votes any ballot contained in an envelope which is not endorsed with the names of the Clerks of the Election, as provided in this Chapter, or any ballot which shall bear such a mark, impression or device that it is apparent that such was placed thereon with the intent of distinguishing such ballot, or any ballot which is contained in any envelope which shall bear any such distinguishing mark, impression or device, shall be void and shall not be counted; and any ballot, or part of a ballot, from which it is impossible to determine the electors choice of candidates shall not be counted as to the candidate or candidates affected thereby; provided, however, that all such ballots and envelopes and all disputed ballots and envelopes shall be preserved by the Inspector, and, at the close of the count, placed with the seals of the envelope packages in the box into which the ballots shall have been put when read." 44 *Del. Laws, c.* 122, § 2.

In the Third Election District of the Second Representative District of New Castle County two hundred ninety-six ballots were voted at the last General Election for various candidates for the Office of Representative in the General Assembly. Of the two hundred ninety-six ballots voted, nine were rejected as being illegal. One hundred one of the remaining two hundred eighty-seven ballots voted and counted were not contained in envelopes signed by the two Election Clerks, which was in direct violation of the provisions of *Sections* 44, 45 and 50, as indicated.

The Election Officials, prior to counting the ballots, com-

mingled the one hundred one ballots taken from the unsigned envelopes with the one hundred eighty-six ballots taken from the signed envelopes in such a manner that now it is impossible to separate the ballots taken from the unsigned envelopes from the ballots taken from the signed envelopes. It is conceded that the one hundred one ballots contained in the unsigned envelopes were illegal ballots and should not have been counted by the Election Officials. It is further conceded that if the one hundred one illegal ballots were voted and counted for Armstrong, the Republican candidate, the result of the election for Representative in the Second Representative District would have been different; that is, the relator, Wahl, the Democratic candidate, would have received the majority vote in the entire Representative District and would have been elected to said office.

Since the one hundred one illegal ballots cannot be separated or distinguished from the one hundred eighty-six presumably legal ballots, and inasmuch as the one hundred one illegal ballots are sufficient in number to change the result of the election, should all of the ballots be rejected in the Third District or should all of the two hundred eighty-seven ballots be counted?

The Election Laws of this State, and especially the Sections cited, reflect great study on the part of our lawmaking bodies to safeguard against the evils accompanying uncontrolled elections. The Sections as indicated were enacted to prevent fraud. They form an integral part of a well-designed plan to safeguard the integrity and purity of the ballot from the time the elector receives his ballot down through the voting stages until it has been finally counted by the Election Officials; thus, preventing the counting of fraudulent ballots by requiring the Clerks of Election to endorse their names upon the envelopes containing the ballots to the end that they may be identified when taken from the ballot box for counting purposes.

In enacting the foregoing Sections the Legislature took a most drastic step towards placing a restriction upon the freedom of the electorate of this State when it provided that no ballot, however honestly cast by the voter, shall be counted unless contained in an envelope bearing the signatures of the two Election Clerks. Now, how are the pertinent provisions of these Sections to be construed? Are they directory or mandatory?

It seems to me that it is far more important to the people of this State, and to the stability of our form of government as well, that these provisions should be held to be mandatory than that occasionally in a voting district the votes of innocent electors be not counted; otherwise, the legislative intent in enacting a law to preserve the integrity and purity of the ballot is defeated, and the very means are afforded to protect and cover up corruption and venality.

In the case of *Turner v. Teller*, (*Tex. Civ. App.*) 275 *S. W.* 115, 116, the Court in dealing with similar provisions stated, "The requirement that the presiding judges shall write their signatures upon the ballots to be voted is mandatory, but it is made so only because it is expressly provided * * * that ballots not so indorsed shall not be counted." Likewise, in the case of *Ledbetter v. Hall*, 62 *Mo.* 422, the Court held that a statute making it the duty of Judges of Election to cause to be placed on each ballot the number corresponding with the number of the voter offering the same, and providing that no ballot not so numbered shall be counted, is mandatory and must be enforced. Mr. McCrary in his work on Elections, Paragraph 226, in commenting on the Missouri ruling, states, "Although this doctrine may sometimes result in very great hardship and injustice by depriving the voters of their rights by reason of the negligence or misconduct of the Officers of Election, it is nevertheless difficult to see how any different construction could have been

placed on such a statute. Statutes which simply direct the Judges of Election to number the ballots without declaring what consequences shall follow if this be not done may well be held to be directory only; but where the statute both gives the directions and declares what the consequences of neglecting their observance shall be, there is no room for construction. Such statutes are intended to prevent fraudulent voting, and, if the Legislature is of the opinion that the general good to be derived from their strict enforcement will more than counterbalance the evils resulting from the occasional throwing out of votes honestly cast, the Courts cannot reconsider the mere question of policy. The legislative will upon such a subject, when clearly expressed, must prevail." *Sego v. Stoddard,* 136 *Ind.* 297, 36 *N. E.* 204, 22 *L.R.A.* 468; *Kreitz v. Behrensmeyer,* 125 *Ill.* 141, 17 *N.E.* 232, 8 *Am. St. Rep.* 349; *Major v. Barker,* 99 *Ky.* 305, 35 *S. W.* 543; *Slaymaker v. Phillips,* 5 *Wyo.* 453, 42 *P.* 1049, 47 *L.R.A.* 842; *Russell v. McDowell,* 83 *Cal.* 70, 23 *P.* 183; *Parvin v. Wimberg,* 130 *Ind.* 561, 30 *N.E.* 790, 15 *L.R.A.* 775, 30 *Am. St. Rep.* 254; *Hammond v. Love,* (1946) 187 *Md.* 138, 49 *A.* 2d 75; *Kirkpatrick v. Deegans,* 53 *W. Va.* 275, 44 *S.E.* 465; *Orr v. Bailey,* 59 *Neb.* 128, 80 *N.W.* 495; *People v. Rinehardt,* 161 *Mich.* 585, 126 *N.W.* 704.

The pertinent provisions of Sections 44, 45 and 50 must be held to be mandatory and as such essential to the legality of votes cast at the election in the Third Election District of the Second Representative District at the last General Election.

The intervening defendant, Armstrong, contends that even though the pertinent provisions as written in the foregoing Sections be found to be mandatory, nevertheless, their force and effect as such has been rendered inoperative in this instance by reason of the fact that the Election Officials in counting the ballots in the Third Representative

District did not "segregate" the ballots and the envelopes not signed by the Clerks of Election, as he asserts they should have done under the provisions of Section 50, in order that they might later be identified by the Canvassing Board. Consequently, he says under the present circumstances the pertinent provisions of the Sections should be construed to be directory only, and that all of the one hundred one illegal votes should be counted. I find the contention of the defendant in this respect to be without merit. This, however, necessitates a recital and construction of the Section in question.

"1859. Sec. 50. Distinguishing Marks; When Ballots Not Counted; Disputed Envelopes and Ballots How Preserved; Unused Envelopes Destroyed; Counted Ballots and Envelopes How Disposed of; Ballots; How Counted and Disposed of:—In the counting of the votes any ballot contained in an envelope which is not endorsed with the names of the Clerks of the Election, as provided in this Chapter, or any ballot which shall bear such a mark, impression or device that it is apparent that such was placed thereon with the intent of distinguishing such ballot, or any ballot which is contained in any envelope which shall bear any such distinguishing mark, impression or device, shall be void and shall not be counted; and any ballot, or part of a ballot, from which it is impossible to determine the electors choice of candidates shall not be counted as to the candidate or candidates affected thereby; *provided, however, that all such ballots and envelopes and all disputed ballots and envelopes shall be preserved by the Inspector, and, at the close of the count, placed with the seals of the envelope packages in the box into which the ballots shall have been put when read.*"

The question is, What meaning should be ascribed to the italicized portion of the Section? The defendant argues

that it is a "proviso," which restricts the operation of the mandatory provisions of the Sections to cases only where the ballots and the envelopes not signed by the Election Clerks have been preserved "by means of segregation" in order that they might later be identified by the Canvassing Board.

It is quite clear that the words "provided, however", as employed, are simply used in the conjunctive sense and have no greater significance than the words "but" or "and". It is well established that the word "provided" does not convert the words following into a "proviso," as it may be used in a conjunctive sense and precede an independent clause. *Bowers v. Missouri Mutual Asso.*, (1933) 333 *Mo.* 492, 62 *S.W.* 2d 1058; *State v. Mooneyham*, (1923) 212 *Mo. App.* 573, 253 *S.W.* 1098; *Carter-Webster & Co. v. U. S.*, (4 *Cir.*, 1906) 143 *F.* 256; *Radil v. Morris & Co.*, (1919) 103 *Neb.* 84, 170 *N.W.* 363, 7 *A.L.R.* 539. Whether it is a "proviso" in effect or merely a conjunctive equivalent to the word "and" or the word "but" must in part be determined from the context and from all the pertinent provisions of Sections 44, 45 and 50, respectively, relating to the same subject matter. *Davis Finance & Securities Co. v. O'Neal*, ( *La. App.*) 160 *So.* 463; *State v. Mooneyham*, 212 *Mo. App.* 573, 253 *S.W.* 1098.

When the foregoing Sections are considered as a whole, the words "provided, however" simply mean that the ballots and envelopes should be "preserved". Any other construction would render nugatory the pertinent mandatory provisions of the Sections and defeat the very purpose for which they were enacted. It is inconceivable to me that the Legislature in enacting these mandatory provisions to insure the integrity and purity of the ballot, specifically stating what ballots are void and not to be counted, at the same instant wiped out the effect and purpose of the pro-

visions by stating that if they were "not preserved by means of being segregated" they were to be counted. Under such reasoning any fraudulent scheme need only be broadened by commingling illegal ballots with legal ballots, as here, in order to defeat the only purpose for which the mandatory provisions were enacted by the General Assembly.

I recognize the rule of statutory construction that, in order to ascertain legislative intent, words omitted may be read into a statute, but in doing so we cannot demolish the very purpose for which the statute was enacted, nor restrict its application in a manner inconsistent with true legislative intent. To say that each ballot with each envelope not signed by the Election Clerks must be "segregated", in order that the Board of Canvass may identify the illegal ballots contained in the unsigned envelopes, is but amending in judicial fashion the underlined clause with a further directory provision providing the precise manner in which the envelopes and ballots are to be preserved, and directing that only those that are "segregated" fall within the mandate of the Sections. We must not forget that the power of statutory amendment reposes entirely within the legislative realm and cannot be usurped by any tribunal under the guise of judicial interpretation.

Even if it were assumed arguendo that the clause in question is a "proviso", it would not in this case have the effect of nullifying the preceding mandatory language. This is so for the reason that the clause merely directs that the ballots and envelopes should be "preserved" as distinguished from "destroyed." The manner in which the ballots and envelopes shall be preserved is not designated and cannot be judicially read into the clause.

I conclude Section 50 to mean that, if the votes are void by reason of the ballots being in unsigned envelopes, they should not be counted, but that the envelopes and

ballots should be preserved. That is all the language says. It does not require "segregation" of the ballots and envelopes, although, if the Election Officials had voluntarily adopted such a course, it would have been most helpful in the present case. The clause is in no sense a modifying "proviso" but simply an independent directory clause requiring the ballots to be "preserved", which was done by the Election Officials; thus, the mandatory provisions directing that certain ballots should not be counted has not been nullified and must be enforced.

Now should all the ballots be rejected?

Of course, the power to reject an entire poll is certainly a dangerous power, and, though it belongs to whatever tribunal has jurisdiction to pass upon an election, it should be exercised only in extreme cases; that is to say, in part, cases where incompetency, inefficiency and a reckless disregard of essential mandatory requirements of the Election Law, as shown here, prevailed to such an extent that the true state of the vote in the Election District could not possibly be ascertained. Of course, the rule of exclusion as to the entire poll is never applied in cases of neglect on the part of Election Officials unless the violations relate to essential requirements of the law, and not so then if the poll can be purged of the illegality, or, if it cannot be so purged, the illegal votes are not sufficient in number to change the result of the election. This is so for the reason that the legal votes cast in a District should not be rejected because of the misconduct of the Election Officials whenever possible to avoid such rejection. Nevertheless, we cannot lose sight of the fact that, if any persons are to lose their votes by reason of the misconduct or negligence of Election Officials, it should be those who reside in the Election District where the wrongdoing occurs, rather than to have the legal votes in other Districts

overcome by the misconduct or negligence taking place in other Districts over which they have no control.

If the law provided merely that the envelopes should be signed by the Election Clerks and did not provide that ballots contained in unsigned envelopes should not be counted, I would agree with the majority, under the circumstances of the present case, and say that it would be proper to count all of the ballots. I say this for the reason that I would construe the pertinent provisions of Sections 44 and 45 as being directory only and their observance by the Election Clerks not essential in the sense that the violation thereof would necessarily invalidate the one hundred one votes in question. Here we are dealing with the violations of essential mandatory provisions of the foregoing Sections, the result of which has rendered unreliable the true state of the vote in the Third Election District. The number of illegal votes cast in this Election District is sufficient to change the result of the election, and no one can purge the poll of the illegality.

The majority in their endeavor to save one hundred eighty-six legal ballots have found it necessary to count one hundred one illegal ballots, which the Legislature has said are void and cannot be counted, irrespective of the intention of the voters. They say that the provisions of Paragraph 1858 of the Code of 1935 justifies, in part, their position.

"1858: All ballots cast at any election shall be counted for the persons for whom they were intended, so far as such intention can be ascertained therefrom, and in determining the intention the following rules shall be observed."

Paragraph 1858 continues by setting forth the manner in which the intention of the voter is to be ascertained in considering each ballot. For instance, "If the elector

shall place on his ballot a cross mark or "X" within the space containing a party emblem, he shall be deemed to have voted for all the candidates whose names appear in the column under such mark, unless some name or names shall be erased, or unless in some other column he shall have placed a mark in the square at the left of the name of some other candidate for the same office."

The fallacy in the majority's approach in this respect becomes apparent when it is realized that only legal ballots can be counted under the provisions of Paragraph 1858, and only then when they can be identified as such. Here the one hundred eighty-six legal ballots cannot be so identified; thus, the provisions of Paragraph 1858 cannot be enforced.

The Boards of Canvass in this State during the last twenty-five years have consistently rejected ballots because of statutory illegalities, regardless of the fact as to whether or not the intention of the voter could be ascertained from the ballot.

In reaching their conclusion the majority of the Court have adopted a policy embodying their concept of fairness in the light of the circumstances presented. But here the Legislature under the foregoing Sections, in order to prevent fraud at elections, has announced a policy which must be admitted to be in conflict with the view of the majority of the Court. The Legislature has said that the general good to be derived from the enforcement of the provisions of the foregoing Sections will more than counterbalance the evils resulting from the occasional throwing out of votes honestly cast. Whenever a conflict in policy be found to exist, such as here, the legislative will upon the subject, when clearly expressed, must prevail.

Mr. Armstrong has intervened for the purpose of

having the entire poll counted, in order that he may have the benefit of the full count. I think before any benefit can accrue to him he must first purge the poll of the illegality; otherwise, the poll must be rejected in its entirety.

It is unfortunate indeed that electors should lose their votes because of the negligence of Election Officials. But, as has often been said, it would be a greater evil for the Courts to ignore the law itself by permitting Election Officials to ignore essential mandatory requirements designed to safeguard the purity and integrity of the election. If the long established safeguard, as provided for under the foregoing Sections, to preserve the integrity and purity of the ballot has become unnecessary or should be changed, modified or restricted, it is not for this Court to do so.

It is my opinion that the entire vote of the Third Election District should be rejected, and that the writ as prayed for should issue.