GEORGE GREEN AND OTHERS v. INDEPENDENT
CONSOLIDATED SCHOOL DISTRICT NO. 1, LYON COUNTY.

89 N. W. (2d) 12.

March 21, 1958—Nos. 37,281, 37,395.

*J. B. Forbes,* for appellants.
*Meehl, Catlin & Wiltrout* and *Glenn Catlin,* for respondent.

MATSON, JUSTICE.

In an action contesting the validity of a special school election wherein the voters approved a bond issue, contestants appealed first from an order denying their motion for a new trial and subsequently also from the final judgment entered. The appeals have been consolidated for review.

On December 10, 1956, the Board of Education of Independent Consolidated School District No. 1 of Lyon County resolved to borrow money for the betterment of the schoolhouse in the district and to acquire additional land adjoining the school site with moneys on hand. The board submitted the proposed betterment and land-acquisition projects to the qualified voters for approval at a special election held January 23, 1957, upon a ballot which read:

"QUESTION No. 1

"SHALL THE SCHOOL BOARD OF INDEPENDENT CONSOLIDATED SCHOOL DISTRICT NO. 1 OF LYON COUNTY, MINNESOTA, BE AUTHORIZED TO BORROW MONEY BY ISSUING NEGOTIABLE COUPON GENERAL OBLIGATION BONDS OF THE DISTRICT IN AN AMOUNT NOT TO EXCEED $275,000 FOR THE BETTERMENT OF THE SCHOOLHOUSE OF THE DISTRICT IN THE VILLAGE OF LYND, MINNESOTA?

\* \* \* \* \*

"QUESTION No. 2

"SHALL THE SCHOOL BOARD OF INDEPENDENT CONSOLIDATED SCHOOL DISTRICT NO. 1 OF LYON COUNTY, MINNESOTA, BE AUTHORIZED TO EXPEND AN AMOUNT NOT TO EXCEED $3,500 OF FUNDS ON HAND WHICH HAVE BEEN RAISED PURSUANT TO THE PROVISIONS OF M. S. A. 127.04 TO ACQUIRE AS A SCHOOL SITE LAND WHICH ADJOINS THE PRESENT SCHOOL SITE IN THE VILLAGE OF LYND, MINNESOTA?"

According to the final report of the election judges, the bond issue was approved by a vote of 271 to 234 on question No. 1 and the land acquisition was approved by a vote of 267 to 234 on question No. 2. A total of 505 votes were cast. The election board, however, found 4 ballots either blank or spoiled as to question No. 2. Upon a recount, the referee inspectors appointed by the court found 69 ballots to be of disputed validity. The trial court, however, upheld the tally originally made by the election board.

Contestants' appeals raise these basic issues: (1) Was question No. 1 stated on the ballot in conformity to the statutory requirement that only a single proposition or question shall be submitted to the voters as distinguished from alternative proposals?[1] (2) Is question No. 1 invalid for fraud in having misled the voters into assuming erroneously that $50,000 was available and on hand? (3) Is the election void because of irregularities in its conduct? (4) Was the secrecy of the ballot destroyed by printing the ballots on transparent paper? (5) Was the trial court's decision based on evidence obtained outside the record?

■ Was question No. 1 stated on the ballot in violation of M. S. A. 124.02, subd. 2, which provides that each proposition or question submitted shall be stated separately on the ballots? A comparison of question No. 1 herein with the question involved in Buhl v. Joint Independent Consol. School Dist. No. 11, 249 Minn. 480, 82 N. W. (2d) 836, shows that the Buhl case is controlling. In the Buhl case the claim was that Green v. Independent Consol. School Dist. No. 1, 243 Minn. 519, 68 N. W. (2d) 493, established as a matter of law that the question violated § 124.02, subd. 2. Since precisely the same claim was involved in the Buhl case as that now raised herein by the contestants, we find contestants' claim to be without merit and that question No. 1 is in conformity with § 124.02, subd. 2, as submitting only one proposition or question on the ballot.

Were the voters, however, fraudulently misled by ballot question No. 1 into concluding erroneously that $50,000 was on hand and available

---

[1]*Caveat.* It should be noted that in 1957 the legislature amended M. S. A. 475.59 to authorize submission to the voters of certain questions "stated conjunctively or in the alternative." See, L. 1957, c. 318, § 1.

for the school-betterment project? Upon the evidence we find no implied misrepresentation of fact. The anticipated cost of the project was $325,000 which meant that $50,000 would have to be found in addition to the bond-sale proceeds of $275,000. An examination of the record shows that information alleging $50,000 was available was distributed and published. This figure was given publicity by the superintendent of the Lynd school. It was estimated that $51,178.78 would be on hand at the end of the fiscal year. Approximately $15,000 of this amount was available in the building fund. Contestants erroneously assume that the latter amount is the only balance available for building purposes. The evidence sustains a finding that other funds in the necessary amount would be available for the expenses of completing the proposed new school project. In fact there is no basis in the evidence for a contrary finding. Furthermore, the superintendent of schools made his estimate of available funds in good faith and with the aid of professional advice. The trial court did not err in finding that there had been neither misconduct nor misrepresentation on this issue.

 Before passing on the issue of whether the election was invalidated for irregularities in its conduct, it is desirable to determine the controlling statutory provisions.[2] The statutory authority for calling a special election by resolution is given to the school board of an independent school district by § 124.08. This section further provides that a special election should be held in the same manner as an annual election. The statutory provisions regulating the conduct of an annual election, which control the bond election in this case, are embodied in c. 124.

---

[2]*Caveat.* In future cases counsel should not overlook that the statutes controlling the school-district election herein have, to a considerable extent, been repealed by the legislature. See, L. 1957, c. 947, art. V. This chapter repeals §§ 122.01 to 122.571, 123.01 to 123.23, 123.30 to 123.57, 124.01 to 124.10, 124.12 to 124.26, 125.01 to 125.09, 125.10 to 125.33, 125.41 to 125.43, 133.05, and became effective by its terms July 1, 1957, but see discrepancy between title and art. IX, § 9, of said chapter. This case is, of course, not subject to the subsequent statutory changes since it was tried before they became effective. § 645.21; 17 Dunnell, Dig. (3 ed.) § 8946.

The general election laws contained in cc. 200 to 212 are expressly made inapplicable as a whole to school-district elections by § 200.02, which provides:

"The word 'election,' as used in chapters 200 to 212, means and includes any election, *except those held in any school district,* at which the electors of the state or of any sub-division thereof nominate or choose by ballot public officials or decide any public question lawfully submitted to them." (Italics supplied.)

In fact in 1940 this court expressly pointed out and held[3] that § 200.02 eliminated § 208.07 as a source of authority for the conduct of school-district election contests. In 1955, however, the legislature restored authority for the conduct of school election *contests* by enacting § 208.11, which provides:

"Voters in school elections in independent, consolidated, re-organized, joint, common, county, 10 or more township, and associated districts *may contest an election in accordance with* Minnesota Statutes, *Sections 208.07, 208.08, 208.09, 208.10.*The provisions of these sections apply to these school elections." (Italics supplied.) L. 1955, c. 404, § 1.

The effect of this statute (§ 208.11) was to make the four sections cited therein applicable to school-district election *contests. It is not to be overlooked, however, that § 200.02 still excludes the application of any provision not included in § 208.11.*[4]

The effect of these statutory provisions, as modified in 1949 and 1955, is that *only* the portions of cc. 200 to 212 specifically made applicable to school-district elections (namely, §§ 208.07 to 208.10 and c. 203[5]) are involved herein as statutory requirements. *All other provisions of the general election laws are inapplicable to this case.* The

---

[3]Johnson v. DuBois, 208 Minn. 557, 294 N. W. 839.

[4]Section 200.02 also originally excluded from application to school-district elections the absentee voter's statute found in c. 203. See, M. S. A. 1945, § 203.01; Opinion Attorney General, No. 187-A, July 17, 1929. Subsequently, the exclusionary sweep of § 200.02 was modified by amending § 203.01 to include *any school election* within c. 203. See, L. 1949, c. 365, § 1.

[5]See footnote No. 4.

statutes governing the election herein are found in c. 124, as noted above.

In turning to a consideration of the election irregularities herein, we are confronted with these four significant factors:

(1) Except as to §§ 208.07 to 208.10, both numbers inclusive, and c. 203, the school-district election herein is governed by c. 124 and not by the general election laws. Many of contestants' alleged errors have no merit since they are based on an alleged violation of statutory provisions which have no application.

(2) After an election has been held, applicable statutory provisions are generally construed as directory.

(3) The burden of proof rests upon the contestants.

(4) The trial court's findings are in favor of the contestee.

Basic to a determination of whether an election is void because of irregularities in its conduct is the general rule that *before an election is held* statutory provisions regulating the conduct of the election will usually be treated as mandatory and their observance may be insisted upon and enforced.

"* * * *After an election has been held,* the statutory regulations are [however] generally construed as directory and such rule of construction is in accord with the policy of this state, which from its beginning has been that, in the absence of fraud or bad faith or constitutional violation, an election which has resulted in a fair and free expression of the will of the legal voters upon the merits will not be invalidated because of a departure from the statutory regulations governing the conduct of the election except in those cases where the legislature has clearly and unequivocally expressed an intent that a specific statutory provision is an essential jurisdictional prerequisite and that a departure therefrom shall have the drastic consequence of invalidity."[6]

The first irregularity relates to the appointment of the election officials. Section 124.02, subd. 2, provides that the school board shall

---

[6]In re Order of Sammons, County Superintendent of Schools, 242 Minn. 345, 350, 65 N. W. (2d) 198, 202; State ex rel. Burnquist v. So-Called Independent Consol. School Dist. No. 46, 242 Minn. 320, 65 N. W. (2d) 117.

choose three election judges to act as clerks of election and to canvass the ballots cast. The school board in fact appointed three judges and two clerks. The clerks were not authorized by the statute and undoubtedly could not be de jure officers. Lack of a de jure status is not necessarily fatal. If persons dealing with the election board recognized it as the official body conducting the election, and the board acted, as here, under color of authority, the board had a de facto status and it follows that the election is not void.[7]

■ Since the failure of election judges to take an oath, even though it is prescribed by statute, does not invalidate an election,[8] no material significance is to be attached to the fact that the election officials herein took an oath in a form prescribed by a nonapplicable statute (§ 205.54) or to the further circumstance that the oath as signed by them was defectively acknowledged. As evidence of their good faith it is significant, in any event, that they did take an oath pursuant to § 205.54 whereby they solemnly swore to conduct the election according to law to the best of their ability and that they would studiously endeavor to prevent fraud, deceit, and abuse in conducting the election.

It is true that no one actually counted the number of blank ballots received from the printer but that of itself is of no significance. No statute requires such counting. Furthermore, the total number was reasonably established as 700 by the testimony of the printer who said he had only cut sheets sufficient for that number.

■ Many other irregularities occurred. One judge was tardy for a very few minutes at the opening of the polls. Counting of the ballots was not performed in such a manner that each person was checked by a second person, but each counted his own ballots twice. Two de facto clerks counted ballots. There was a failure to count the unused and spoiled ballots and a failure to enclose the election records and ballots in sealed containers before they were deposited in a ballot box for safekeeping. Furthermore, the printed ballot blanks did not contain the facsimile signature of the clerk and the blank ballots were initially

---

[7]In re Contest of Election of Vetsch, 245 Minn. 229, 237, 71 N. W. (2d) 652, 658; 18 Am. Jur., Elections, § 38.

[8]Hagen v. Consolidated School Dist. No. 111-74, 156 Minn. 268, 194 N. W. 756; Taylor v. Taylor, 10 Minn. 81 (107).

delivered to the superintendent of schools instead of to the clerk. There was a discrepancy as to one voter between the two registration lists kept by two clerks but this discrepancy was promptly corrected when it was discovered that one clerk had inadvertently omitted the name of a voter. After the ballots had been counted and deposited and locked in the ballot box for safekeeping, the box was again opened to remove four ballots for attachment to the election certificates. Many of these irregularities involved at best only a violation of inapplicable statutes, but irrespective of whether any applicable statutes were violated, the irregularities are of no particular significance. The basic question is whether the election, despite irregularities in. its conduct, resulted in a free and fair expression of the will of the voters on the merits.[9] The evidence sustains the trial court's finding that the irregularities involved no fraud and did not deprive the voters of the opportunity to express their will on the merits. Significantly, the votes were both cast and counted under the vigilant eyes of the contestants. There was a proper accounting of all ballot blanks and of all votes cast. The evidence sustains a finding that the election officials exercised good faith and made a serious and bona fide attempt to conform to law to the end that the rights of the voters were protected and respected.

■ Contestants have forcefully urged that our decision in In re Contest of Election of Vetsch, 245 Minn. 229, 71 N. W. (2d) 652, requires a reversal. The Vetsch case is not in point. In that case, although actual fraud was not shown, the officials in charge of the election committed such serious and numerous violations as to indicate not only an utter unawareness or disregard of election laws, *but also such a striking absence of effort to comply with any law that no confidence could be placed in the integrity of the election.* An absence of all effort to comply with the law is the equivalent of bad faith. Here instead we have a good-faith attempt to comply with the law. Also in the Vetsch case the election judges and clerks who had been appointed by the village clerk without any statutory authority constituted, prior to the counting of the ballots, at best only a de facto election board, *but after*

[9]In re Order of Sammons, County Superintendent of Schools, 242 Minn. 345, 65 N. W. (2d) 198.

*the polls were closed the board occupied neither a de jure nor a de facto status since in counting the ballots the board members were assisted, and even replaced at times, by four unsworn intruders* (contrary to §§ 206.40, 205.53, and 205.54) who (contrary to § 205.47) were related to the election judges and clerks. Furthermore, in the Vetsch case 59 ballots were unaccounted for when 41 votes could have changed the final result. One of the individuals who took over the counting of the ballots had lost a similar election contest to one of the candidates and expressed an opinion that he would like to see his personal friend, Vetsch, win. After all other county precincts were in, Vetsch himself appeared at the polling place and informed the persons counting the La Crescent village ballots what the results were in the rest of the county. Six hours after all other precincts had reported, La Crescent reported a vote which swung the election results to Vetsch. There were so many serious violations in the Vetsch case and such a complete indifference to all law that there could be no reasonable assurance that the result of the election reflected the will of the voters. Under the circumstances no one could reasonably question that the findings of the trial court in the Vetsch election contest were supported by the evidence.

In the present case there is a serious question, however, as to the validity of 13 ballots cast by absentee voters.[10] Since, however, these 13 ballots, if held invalid and disregarded could not change the result, we find it unnecessary to pass on the issue.

■ We find no merit in the contention that the transparency of the ballots deprived the electors of a secret ballot. The evidence sustains the trial court's finding on this issue. The ballots were printed on sufficiently heavy stock that the marks of a voter could not be identified by any casual observer and could be seen only if deliberately held up to the light for that purpose. The evidence shows that the election judge, who occasionally had to refold a ballot because the voter had not left the judge's initial on the outside, did not at any time scrutinize the ballots in a manner which would have revealed how the voter had marked his ballot. We also have the significant fact that one of

---

[10]See footnote No. 4.

the contestants stood beside the ballot box as a challenging observer and that at no time did he express any concern or objection as to the conduct of the election judge who deposited the ballots in the ballot box. It was, however, clear and unmistakable error for the trial judge, in passing on the issue of transparency, to compare the ballot with those used in another county. It is elementary that a finding by a trier of fact must be based exclusively upon evidence received in the course of the trial and that it is not permissible to obtain or consider other evidence.[11] The error, however, was not prejudicial since the trial court, in its memorandum which was made a part of its findings and conclusions, indicated that his decision was based entirely upon the evidence received in the course of the trial.

The trial court is affirmed.

Affirmed.