## Democratic County Committee Appeal.

Argued July 1, 1964.   Before Bell, C. J., Jones, Eagen, O'Brien and Roberts, JJ.

*Abraham E. Freedman,* for Democratic County Committee, appellant.

*Levy Anderson,* First Deputy City Solicitor, with him *Edward G. Bauer, Jr.,* City Solicitor, for County Board of Elections of Philadelphia County, appellee.

*Philip Kalodner* and *Gregory M. Harvey,* with them *Robert J. Bray, Jr., Stanhope S. Browne, Joanne R. Denworth,* and *Ferdinand P. Schoettle, Jr.,* for candidate, Genevieve Blatt, appellee.

*Tyson W. Coughlin* and *Edward E. Russell,* for Committee of Seventy, amicus curiae.

ORDER, July 27, 1964:

The Order of the lower Court—which affirmed the unanimous decision of the Board of Elections which held that votes in a so-called blank row were invalid and void—is affirmed.  Opinions to be filed later.

The Court,

(s)  JOHN C. BELL, JR.

*Chief Justice*

Mr. Justice JONES and Mr. Justice O'BRIEN dissent.

OPINION. BY MR. CHIEF JUSTICE BELL, August 5, 1964:

This appeal involves the validity of votes cast in Row C—which is miscalled by the appellant a "blank" row—on voting machines in 15 wards in Philadelphia. An analysis of the facts and the law, as well as the prior decisions of this Court require an affirmance of the Order of the lower Court.  That Order affirmed a unanimous decision of the Board of Elections* which held that votes in the so-called (but miscalled) blank Row C were invalid and void.

---

* Composed of two Democrats and one Republican.

The Jamestown machine, which is involved in 13 wards, was set up as portrayed by the photographic exhibit of the voting machine which appears above and is made a part hereof.

Row C (erroneously called by appellant "a blank row") is the row here involved. *Row C was marked* on the left in relatively small capital letters "SPECIAL ELECTION", and in *enormous* capital letters *"REPUBLI- CAN"*. A long line was then drawn through the middle of this horizontal row with an arrow at the end pointing to a Republican candidate Edward H. Rovner, with a pointer or lever over his name. A photograph of the pertinent parts of the voting machine is attached and made a part hereof as above mentioned, and clearly shows how to vote for a Democrat, if that was the voter's desire.

Subsection (d) of Article XII, §1216 of the Election Code (Act of June 3, 1937, P. L. 1333, 25 P.S. §3056) provides as follows: "(d) At primaries, he shall vote for each candidate individually by operating the key, handle, pointer* or knob, *upon or adjacent*** to which the name of such candidate is placed."

If there had been, on the part of any voter, the slightest doubt concerning (a) the set-up of the voting machine, or (b) the sample ballot, or (c) the way to vote for the candidate of his choice, he could lawfully *and without the slightest difficulty* have obtained assistance, explanation, directions and instructions. Subsections (a) and (b) of §1216 of the Election Code pertinently provide as follows: "(a) In districts in which voting machines are used, the election officers shall, with the aid of the diagram authorized by this act and the mechanically operated model, instruct each elector before he enters the voting machine booth regarding the operation of the machine, and shall give the elector

---

\* Herein called and referred to as a lever.

\*\* Italics throughout, ours.

opportunity personally to operate the model. (b) If any voter, after entering the voting machine booth and before the closing of such booth, shall ask for further instructions concerning the manner of voting, any one of the election officers may give him such instructions, . . . ."

Furthermore, every voter was entitled to a large sample ballot which informed him *twice*—not in confusing language, as appellant asserts, but in *brief clear* language, with a crystally clear picture or diagram— what a careful look at the voting machine would have rendered unnecessary, viz., to vote for a candidate of his choice he should "turn down a pointer *over* the name of each candidate *in your own party row*."

Whether the instructions on the sample ballot were ambiguous and confusing as appellant contends, or were crystal clear as we assert, can be easily determined by reading it. It pertinently provides: "GENERAL PRIMARY AND SPECIAL ELECTION, TUESDAY, APRIL 28, 1964 (large caps)

"INSTRUCTIONS TO VOTER (Smaller caps)

"2nd. Turn down a pointer *over* the name of each candidate *in your own party row* that you wish to vote for, from this position

to this position

and leave it there.

(You will note on the Ballot that the Republican Party occupies the first horizontal row, the Democratic Party the second horizontal row . . . . *Just remember to turn down a pointer over the name of each candidate you wish to vote for* . . . .)"

Notwithstanding all of the foregoing, and although these (Jamestown) voting machines have a lever (pointer) right over or above the name of each Republican candidate to *pull down* if the voter wishes to vote for a Republican, and a similar lever in the row

right over or above the name of the Democratic candidate of his choice, if he wishes to vote for a Democrat, appellant contends that if a voter votes *in a different party Row and in a different space* his vote must nevertheless be counted—and it must be counted as if it were cast in the row and in the space and for the person whom the Court thinks the voter meant to vote for, *but didn't.* In every election there are always some or many ballots which are held to be void and thrown out and not counted. Appellant contends that there were nearly 6000 votes for the Democratic nominee for the United States Senate in 13 wards. Even if this be accurate, when broken down it amounts to less than 12 to a division and less than 7 to each voting machine used in the 13 wards.

Some voters pulled down levers into the miscalled "blank" Row C—a Republican row—*under three spaces in Row B* (the row above C) *where a Democrat's name appeared and some levers under five spaces in Row B, where no candidates' names appeared in Row B.* These are the votes which are challenged in this appeal. No one knows or can determine—*except by guessing,**—whether such votes, or indeed any votes in the blank spaces in Republican Row C, represented (1) protest votes, or (2) non-partisan votes, or (3) Republican votes, or (4) Democratic votes, or (5) votes for Rovner, or (6) "mistake" votes; but in any event, they were illegally cast and were clearly and undoubtedly *void* votes! Moreover, there were several voting machines in which *no votes were cast in Row B,* but votes were cast in Rows A and C. This would indicate that these particular voting machines were used only by Republicans and Non-Partisans. Nevertheless, appellant contends that the votes of all

---

* If the Election Board had had locked (or blocked off) at a cost of $3,000 the blank spaces on Row C, it would have prevented those controversial votes.

Republicans and Democrats and Non-Partisan and protesting and mistaken voters which were cast in this *Republican* Row C, (1) were valid votes, and (2) were cast in favor of the Democratic candidate whose name, if any, appeared above or *near* these blank spaces in Republican Row C. If the pointers which were pulled down into Republican Row C under the name of Blatt or Roberts or Musmanno, represented valid votes for the nominee in Democratic Row B, Genevieve Blatt would have received 2,094 votes, David B. Roberts 181 votes, and Michael A. Musmanno 3,349 votes.

What is the use of a State having election laws to govern an election, what is the use of having *clearly marked voting machines,* and rows on the voting machines which were *clearly marked for a Republican candidate and for a Democratic candidate,* as well as clearly marked sample ballots, if a Court has the right and power—as appellant argues—to ignore and nullify all of these *and substitute its "guess"* as to whom a voter intended to vote for if he hadn't voted carelessly or hurriedly or absent-mindedly or stupidly or protestingly and illegally?

Furthermore, appellant's contention not only ignores the clear language of the Act and the clear set-up of the voting machine and the clear language of the sample ballots, but it also flies in the teeth of numerous prior decisions of this Court: *Weber Appeal,* 399 Pa. 37, 159 A. 2d 901; *Pfaff v. Bacon,* 249 Pa. 297, 95 A. 71; *Rodgers Contested Election,* 234 Pa. 512, 83 A. 476; *Dailey's Appeal,* 232 Pa. 540, 81 A. 655; *Gulick Appeal,* 192 Pa. 446, 43 A. 972; *Newberry Township Election,* 187 Pa. 297, 40 A. 822; *Contested Election of Flynn,* 181 Pa. 457, 37 A. 523; *McCowin's Appeal (Little Beaver Township School Directors' Election),* 165 Pa. 233, 30 A. 955; *Lawlor's Contested Election,* 180 Pa. 566, 37 A. 92; *Redman's Election,* 173 Pa. 59, 33 A. 703.

These cases in principle directly rule the instant case and require this Court to hold such votes to be void. For example, in *Contested Election of Flynn,* supra, the law required the ballot to be marked *with an X opposite* the name of the candidate for whom the voter wished to vote. One ballot was marked in the proper space but with a 1 instead of an X. Another ballot was marked with an X in the vacant square to the right of but below the name of the candidate. The third ballot was marked with a 1 on the line and in the square opposite a candidate's name and with an X in the vacant square below, viz.:

| COUNCIL (mark one) | |
|---|---|
| Edward J. Burke (3 years) | 1 |
| | X |

Notwithstanding the fact that the voters' intention was clear, the Court *voided all* three ballots, thereby giving the election to the apparent loser, and said: ". . . On one of the ballots in question there is no mark in the square opposite the name of the candidate, but there is a cross mark (X) in the square below it. Not one of these ballots is marked according to law. In McCowin's Appeal, 165 Pa. 233, the present Chief Justice, after quoting from sections 14 and 22 of the act, said: 'The marking mentioned in the last quotation is applicable only to candidates whose names are printed in the official ballot. *They cannot be legally voted for in any other way than by marking* as specified in said section.' . . . To hold that the ballots in question are valid is to set aside the plain provisions of the act prescribing the place and manner of 'marking,' and to substitute therefor the *surmises* of the election officers and the courts respecting the intention of the voter.

"The presumption is that the voter knows where and how to mark his ballot. He is furnished on his

request with a card of instruction and a specimen ballot, and if by reason of any disability he desires assistance in the preparation of his ballot he is permitted to select a qualified elector of the district to aid him in the preparation of it. . . . For reasons already stated we decline to hold that the mark of a one (1) in the square provided for the cross mark, or a cross mark (X) in the square below it has the effect of a cross mark (X) in the proper place for it. It follows that the ballots in question should have been rejected as illegal."

*Weber Appeal,* 399 Pa., supra, likewise controls in principle the instant case. *Weber Appeal* involved the validity of 16 stickers for a "write-in" candidate, because of the manner in which the stickers had been attached.

Chief Justice JONES, speaking for a unanimous Court, refused to permit the stickers attached to a card to be regarded as votes for the candidate whose name was on the stickers and pertinently said (page 44): "The technicalities of the Election Law (and they are many) are necessary for the preservation of the secrecy and purity of the ballot and must, therefore, be meticulously observed.* Thus it is, that any write-in or sticker which covers more of the ballot than the

---

* Justice COHEN quoted the *Weber* decision with approval in a recent dissenting opinion in *Reading Election Recount Case,* 410 Pa. 62, 66, 188 A. 2d 254, saying on pages 68 and 69: ". . . It is not important and of no great consequence that the government of the City of Reading may or may not be changed by the action of the majority—what is important and of great consequence is that our court has misread, misinterpreted and misapplied a clear legislative pronouncement. This is particularly true in the interpretation of the election laws which are basic to our democratic system. Hence, I am impelled to follow what Chief Justice JONES said in Weber Appeal, 399 Pa. 37, 44, 159 A. 2d 901, as recently as 1960: 'The technicalities of the Election Law (and they are many) are necessary for the preservation of the secrecy and purity of the ballot and must, therefore, be meticulously observed.'"

blank space provided therefor *invalidates* the vote for the office under which the write-in or sticker appears. See McCowin's Appeal and Lawlor's Appeal, supra. . . . A *misplaced* write-in or sticker, whether on a ballot or on a voting machine, *is of no legal efficacy whatsoever.* To hold otherwise would render facile the way to fraudulent voting and the thwarting of the electorate's will.

"What this court said in Rodgers' Contested Election, 234 Pa. 512, 519, 83 A. 476, is presently peculiarly apposite: 'While it may be that the Court in this instance correctly guessed the intention of the voter, yet the fifty-seven mutilated ballots were not marked in accordance with the instructions contained in the Act of Assembly, and under the well established doctrine in this State they should not have been counted; to permit the counting of such ballots would be a precedent fraught with grave dangers for the future."

In *Peck v. Lackawanna County Board of Elections,* 44 Lackawanna Jurist 97, Justice EAGEN of this Court, then a Judge in Lackawanna County, said that votes cast on a voting machine row *in exactly the same way* as they were cast in the instant case *would be invalid.* That case involved a mandamus proceeding concerning the locking of a voting row, so that well intentioned votes which were carelessly or stupidly "levered" would not be invalidated.

In the course of his Opinion Judge EAGEN said (page 98): "The unfortunate and repeated occurrence of *a candidate losing hundreds of votes* intended for him by well intending voters pulling a lever *over a blank space under his name* will be corrected by the ballot label setup proposed for use in this election."

The only exceptions are two classes of cases, neither of which is applicable—(1) minor irregularities, especially if committed by election officials, and (2) cases where a voter *voted correctly* in the right row

and in the right square and in the right space, but then added something which was surplusage.

Appellant gives three major reasons to support its contention:

(I) General expressions in Opinions in entirely inapposite cases about protecting the vote and the voter. Every Judge favors protecting the voter if that can be done in accordance with the law. However, the generalized quotations which appear throughout appellant's brief appeared in cases which, we repeat, have no relevance and no pertinency to the questions here involved.

(II) Appellant next relies upon Article XII, §1216(d) of the Election Code of 1937, supra, which pertinently provides (as above noted): "At primaries, he shall vote for each candidate individually by operating the key, handle, pointer or knob, *upon or adjacent* [not below, or in the row of the opposite party] to which the name of such candidate is placed."

The interpretation which appellant places upon the word "adjacent" would allow a voter to vote on one machine *both "upon" and "adjacent"* to a candidate, *or* "upon" *or* "adjacent" to a candidate. Furthermore, under appellant's theory, the word "adjacent" could mean (1) *above,* or (2) *below,* or (3) to the *left,* or (4) to the *right,* or (5) *near* to the candidate's name, which realistically is both impractical and absurd. Section (d) clearly and undoubtedly means that a particular voting machine can have a pointer or lever which can be pulled down *upon* the name of the candidate of his choice, viz., a Jamestown machine, or a different type of machine, viz., a Shoup machine which was used in a number of wards. The Shoup machine has a pointer or lever on the right side of the candidate's name (and can be pulled to the left and just beside the candidate's name) and consequently is *adjacent* to the name of the candidate. The Legislative

Act is both clear and realistic. The word "upon" clearly covers and, we repeat, applies to the present Jamestown machine; the word "adjacent" would cover and apply to a different machine known as the Shoup machine, where the pointer and appropriate voting space is, we repeat, on the right of and next to the candidate's name.

(III) The third reason urged by appellant is its desire to carry out the *surmised* intention of the voters and thus avoid "disfranchising" many voters. Such alleged disfranchisement is more superficial than real. In the first place, if there was any disfranchisement the voters carelessly or unthinkingly disfranchised themselves. But even this alleged disfranchisement would apply only to a vote for a United States Senator; it does not affect or invalidate these voters' votes for other candidates on the ballot or on the loan question.

The test which appellant urges us to adopt—no matter how window-dressed or camouflaged, is a "guess" test—it isn't what the voter did that counts, *it's what the Court guesses he intended to do, but didn't.* Such "guess" test would undoubtedly often produce confusion, uncertainty and interminable delay in election cases, thus jeopardizing a candidate's opportunity for successfully campaigning; it would multiply "election litigation"; and it would sometimes produce chaos in Government.

Appellant attempts to justify its "guess" as to "the intention" of the voters by citing several cases which state that ballots must not be "thrown out", or "an election voided", or "voters disfranchised" for "mere minor irregularities" or "technical violations". Until this argument was urged upon the Court, no one ever dreamed that to vote Republican, intending to vote for a Democrat was "a minor irregularity" or "a technical violation". In spite of the appellant's guess, a vote

for a Republican, or a vote *in a row clearly marked "Republican"* is not a vote for a Democrat!

To summarize: In order to reach its conclusion, appellant misinterprets or ignores (1) the clear (pertinent) election laws, and (2) the set-up of election machines which are clear to everyone except to a care‹ less or an absent-minded or a hurried or an unthinking voter, and (3) the marked sample ballots which contain (a) very brief, clearly worded instructions, instructing a voter *twice* in clear, simple, brief language which lever to pull *down* in order to vote for the Democrat or Republican candidate of his choice, as well as (b) a crystally clear illustration, and (4) the words at the left end of Row (C) which state in small capital letters "SPECIAL ELECTION" and *in very large capital letters "REPUBLICAN"*, and (5) the line through the middle of Row C, with an arrow at the right end where the name of the candidate, Edward H. Rovner, appears, and (6) many prior decisions of this Court which, we repeat, in principle directly rule the instant case. Furthermore, appellant has not been deprived of any right ordained or guaranteed by the Constitution of the United States.

For each and all of these reasons, we affirm the Order of the Court below, which affirmed the unanimous decision of the Election Board.

Order affirmed.

Mr. Justice EAGEN concurs in the result.

Mr. Justice MUSMANNO and Mr. Justice COHEN took no part in the consideration or decision of this case.

———

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I join in the opinion of the Chief Justice. An examination of the record facts, particularly of the voting machines which were set up as illustrated in the diagram, which will be found in the reporter's state-

ment of the case, convinces me of the correctness of the result here reached. However, I do feel that I must add these observations.

This opinion is in no way a reflection upon any of the litigants. It is rather an expression of regret for the unfortunate positions in which they have been placed by the inexcusable conduct of the County Board of Elections. Neither of the reasons offered by the Board for its failure to prepare properly the voting machines by locking levers over blank spaces in rows C and D, as legally commanded, even approaches an acceptable explanation.[1] The Board improperly disregarded mandatory provisions of the Election Code and failed to perform clearly directed legal duties.

It is erroneous to assume that those voters who pulled levers in row C intended to vote for candidates whose names appeared above those levers but actually in row B. Such an assumption would be founded on nothing more than the exercise of retroactive clairvoyance as to what was intended on April 28 by 5,624 lever markings over blank spaces recorded on 908 voting machines in 512 election districts in 13 Philadelphia wards.

It is unmistakably evident from the ballot faces of the voting machines, as illustrated in the diagram, that votes for Democratic candidates whose names appear in the second horizontal row, marked "B", may be recorded only by the operation of levers above their names, as the hand pointer in that row clearly indicates. Moreover, there runs through the center of the blanks in row C (and also D) a heavy black line from column 1 through column 39 where an arrow points to the special election in column 40.

---

[1] The initial reason given for the failure to block all levers in rows C and D except for those to be used in the special election was that the Board did not wish to spend the $3,000 such action would require. At oral argument, the Board asserted that it had

Likewise, the sample ballot contains four specific instructions which state with unmistakable clarity that to vote for a candidate, "Turn down a pointer over the name of each candidate in your own *party row* that you wish to vote for." (Emphasis in the original.) This instruction also advises that "the Democratic Party" occupies "the second horizontal row" (here row B), and in at least two other places the voter is cautioned that he may vote only for candidates of his party in the primary.

It is an undisputed fact that levers in row C were operated in columns 1, 17, 18, 19 and others in which no names appeared either above in row B or below the levers in row C. Of particular interest is the use of columns 17, 18 and 19 in row C for the election of dele· gates to the *Republican* National Convention. If the "votes" recorded in columns 2, 3 and 4 of row C were validly cast for candidates in row B, so also were the "votes" in the remainder of row C, an obviously absurd conclusion.

It is conceded that all voters who entered the 908 voting machines in question could, irrespective of their party registrations, turn down levers in any of the columns in row C from column 1 through column 39 as well as the lever in column 40 for the special election. It is likewise undisputed that voters other than registered Democrats could and did operate levers in row C.[2] It would be fallacious to assume that since more Democrats appeared at the polls than the total

attempted to obtain covers for those levers approximately ten days prior to the election but that the manufacturer could not supply them in time.

[2] In those divisions where separate machines were used for the Republican and Democratic primaries, respectively, votes were cast beneath the names of the Democratic candidates for the Senate in row C on the Republican voting machines. The proportion of such votes in row C to the total Republican vote on these machines was approximately the same as the proportion of row C votes to

votes cast for all Democratic senatorial candidates in rows B and C (assuming that the votes in C were for those candidates), only registered Democrats operated levers in row C.[3] Those voters who pulled levers in row C may have done so for the same reason as those Democrats (7,168) who failed or refused to vote for any of the senatorial candidates.

Nor can it be assumed that only registered Democrats voted in row C because it is unlawful to cross party lines in the primary, although the machines did not preclude such crossovers.[4] It may just as easily be assumed that the Democratic voters who intended to vote for the candidates followed the explicit voting instructions and pulled levers only in row B. Otherwise, the Legislature engaged in meaningless enactments of precautionary requirements to prevent crossover voting. The Legislature would have needed only to rely on a presumption that no one acts or votes contrary to the instructions and the Election Code.

To hold that the votes cast below the names of the candidates are valid would require the interpretation of "upon or adjacent" in §1216(d) of the Election Code as *either* upon or adjacent." Under such a view, voters would be given the choice of pulling down the lever over the candidate's name, as the instructions provide, or pulling down the lever under the name, as appellants would have us hold. Appellants contend that the levers in row C, with no names ap-

---

total votes on machines used for both parties. It should also be noted that some "votes" even appeared in columns 2, 3 and 4 of row D.

[3] In the 15 wards in question (including two using the Shoup machines), 80,412 Democrats signed voters' certificates, whereas a total of only 73,244 levers were pulled down in both rows B and C combined in columns 2, 3 and 4. (Figures supplied by Democratic City Committee.)

[4] An assumption that no crossovers took place is consistent with the "unwise" pre-election position of the Board of Elections that it would be unnecessary to lock rows C and D. However, fol-

pearing below them, are "adjacent" to the names in row B and would have us credit row C candidates with votes both above and below their names. The appearance of names in row C below the levers in row C would not make those levers any less "adjacent" to the names in row B. Thus, the absurd situation would result that in a general election, for example, the candidate in row A might also claim votes cast below in row B as "intended" for his name in row A and "adjacent" to it.[5]

Some concern has been voiced that by not counting the markings over the blanks in columns 2, 3 and 4 in row C and by not attributing those votes to candidates whose names appear in row B, 5,624 voters will be disfranchised. The application of this kind of paternalism would ignore the fact that 24 out of every 25 voters[6] who entered the voting booths in the districts in question voted correctly, regularly and in accordance with the instructions to voters. Also, no one knows who pulled the levers in row C, their party registrations, and the reasons for preferring to pull levers in row C rather than those in either rows A or B (it being admitted that all voters could operate levers in row C). Moreover, no one knows whether those who operated the levers in row C did so by mistake or by design, just as no one knows why 7,168 Democratic voters who entered the voting booths chose not to cast votes for any of the senatorial candidates.

Realistically, those voters who pulled improper

---

lowing the election, the Board was satisfied that voters other than Democrats voted in row C and so found as a fact.

[5] Even more confusion and uncertainty would result in a primary election in which the number of candidates for any office requires more than one row for listing their names.

Thus, the suggested interpretation of "upon or adjacent" would render useless thousands of voting machines in the Commonwealth.

[6] More than 120,000 voters appeared at the polls in the wards here involved.

levers in row C, columns 2, 3 and 4, are no more disfranchised than those who operated levers in other columns in that row where there were no names above or below. Thus, the voter who undertook to operate levers contrary to instructions and to established custom or who chose not to pull any lever at all is no more entitled to have his "vote" counted than the voter who failed to appear at the polls.

To give so much weight to so conjectural an expression of a minute minority (less than one out of 25) indeed would be an extreme overemphasis of the possible disfranchisement of 5,624 voters to the utter disregard of the more than 120,000 voters (both Republican and Democratic) in these districts who voted properly and in accord with the instructions on use of voting machines. This becomes even more apparent in light of the more than 1,000,000 votes properly cast without irregularity in the Democratic primary throughout the state.

Furthermore, it cannot truthfully be said that these 5,624 voters would be disfranchised since many may have voted correctly for other candidates, on the loan question, and in the special election.[7]

Voting machines have been used in this Commonwealth for more than thirty years in the conduct of thousands of local, state and national election contests. No one has ever successfully contended that levers in one row may be utilized to vote for candidates whose names appear in another row.[8]

---

[7] The total of votes cast in columns 2, 3 and 4 of row C was much greater than the totals in columns further down the row.

[8] In *Application of Lester*, 127 N.Y.S. 2d 272 (S. Ct. 1953), as in the instant case (except for the special election), the Republican candidates were on row A, Democratic candidates on row B, and no candidates on row C. There, as here, the law required that each lever on row C should be locked. In both cases, this was not done and constituted an absolute failure to perform

Under the circumstances here presented, our Court may not order row C "votes" to be counted for candidates whose names appear in row B.

Neither *Gray v. Sanders*, 372 U.S. 368, 83 S. Ct. 801 (1963), urged at argument, nor any earlier or more recent decision, compels, supports or even suggests a result contrary to that reached here. The Supreme Court did not say nor imply and surely did not intend that *invalidly* cast votes be counted under the doctrine of "one man, one vote," or any other theory just as that Court would not demand that each voter who appeared at the polls cast a vote for each office.[9]

We must not be misguided or misled by what is asserted to be possible disfranchisement of those relatively few voters who operated levers in a manner other than in accordance with the clear instructions and the election laws. Our concern must lie primarily with the preservation of the sanctity of the election process by giving effect to those votes properly cast. To do

---

a duty specifically commanded by statute. There, as here, when the machines were opened, it was found that some levers had been pulled in row C. It was maintained that since the votes cast in row C were in closest proximity to row B, it was to be inferred that those who pulled levers in row C did so with the intention of voting for the candidates in row B. The New York court rejected this contention, just as did the Philadelphia County Board of Elections, the court below, and now this Court. The New York court held that the inference there urged ". . . is not the only inference to be drawn. No one knows what voters cast their votes on Row C. If it were done by error, rather than by design, then not even the voters who did so, could now so state, since they are probably without knowledge that they did so. There is no way of telling whether those who cast their votes on Row C did so designedly, because they had no intention of voting for either of the two major parties' nominees." Id. at 276.

[9] In this proceeding no claim was made by a voter or litigant that any voter was denied the right to vote or refused the opportunity to cast his ballot. So, too, no federal question—constitutional or otherwise—was properly or precisely raised, submitted or argued in this appeal. The record fails to reveal the presence of any such question.

otherwise is to ignore the prescribed rules of the contest. Obviously, such action destroys not only the recognized machinery for expressing and recording the preference of voters but also imperils the whole orderly electoral process.

Another look at the diagram (of the face of the voting machine ballot) reinforces the correctness of the determinations of the Board and the court below. That additional look also further re-emphasizes the propriety and wisdom of affirmance here.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

Convinced that the decision of the majority of this Court, which results in the disfranchisement of thousands of voters, is contrary both to law and common sense, I register my dissent.

The *stated* bases of the majority's ruling are: (1) the election law clearly proscribes the manner in which these disputed votes were cast; (2) the "set-up of [the] voting machines" was "clear to everyone"; (3) the "sample ballots" [herein called by the statutory term "specimen ballots"] were clearly worded and illustrated and they instructed the voters which lever to operate; (4) the words "Special Election, REPUBLICAN" to the left of Row C and the line drawn horizontally across Row C on the machines constituted clear instructions which were ignored by the voters; (5) the case law in this Commonwealth "directly rule[s] the instant case". In this opinion, I shall endeavor to demonstrate—not in the same order—the infirmity of each and all the bases upon which the majority opinion rests.

On this appeal we are called upon to determine the validity of certain votes allegedly cast for certain candidates in thirteen wards of the City of Philadelphia at the primary election held on April 28, 1964.

The disputed votes were cast upon voting machines,[1] not paper ballots. In the thirteen wards involved in this appeal a special election was conducted for representative in the U. S. Congress; by reason of that fact, two additional horizontal voting rows were added to each machine. The top row of each machine contained the designation of the various offices for which the electors were to select candidates, including that of representative in the U. S. Congress.[2] The second row—Row A—at the extreme left whereof was the name "Republican"—, contained the names of the Republican candidates for the various offices and within each ballot label thereon were a numeral or numerals and the name or names of the Republican candidate or candidates for the particular office. The third row—Row B—, at the extreme left whereof was the name "Democratic"—, contained the names of the Democratic candidates for the various offices and each ballot label thereon was arranged in the same manner as in Row A. The fourth row—Row C—, at the extreme left whereof appeared the words "Special Election, REPUBLICAN", contained no names whatsoever,[3] except that at the extreme right end thereof appeared the name of the Republican congressional candidate at the special election, and, across Row C, was

---

[1] In *all* the wards involved in this appeal, the Jamestown type of voting machine—wherein the voting rows are arranged horizontally—was used. In the 43rd and 49th wards, which are not involved in this appeal but to which reference is made in the briefs, the Shoup type of voting machine—wherein the voting rows are arranged vertically—was used.

[2] From the "ballot label" containing the name of the office "Representative in Congress" on the top row, an arrow, pointing downward, crossed Rows A and B and ended at Row C.

[3] The majority opinion repetitively condemns the Committee's reference to Row C as a "blank row". The *fact* is that Row C *was* "blank" in that it did not contain the names of any candidates, except that of the Republican congressional candidate.

an arrow which extended to the ballot label wherein appeared the name of the Republican congressional candidate. The fifth row—Row D—, at the extreme left whereof appeared the words "Special Election, DEMOCRATIC", was similar in all respects to Row C, except that at the extreme right thereof appeared the name of the Democratic congressional candidate. Upon this appeal, we are concerned only with the validity of the votes cast in Row C by the depression of the levers directly *above* Row C and *below* the names of the Democratic candidates in Row B, excluding, of course, votes cast in Row C for the Republican congressional candidate at the special election.

Between the top row and Row A and extending horizontally across the machine was a panel of levers marked "A"; between the second row—Row A—and the third row—Row B—was another panel of levers marked "B"; between the third row—Row B—and the fourth row—Row C—was another panel of levers marked "C". When a Republican voter entered the polling booth, the levers in panel "A"—*above* the names of the Republican candidates—were unlocked and the levers in panel "C"—*below* the names of the Democratic candidates—were unlocked but the levers in panel "B"—*below* the names of the Republican candidates—were locked. When a Democratic voter entered the polling booth, both the levers in panel "B"—*above* the names of the Democratic candidates—and the levers in panel "C"—*below* the names of the Democratic candidates—were unlocked so that a Democratic voter could depress and operate *either*[4] the levers *above* or

---

[4] *Both* the levers in panel "B" and in panel "C" *above* and *below* a particular candidate's name could not be depressed and operated so that the voter could vote twice for such candidate. The majority opinion states: "The interpretation which [the Committee] places upon the word 'adjacent' [in the statute] would allow a voter to vote on one machine *both* 'upon' *and* 'adjacent'

*below* the Democratic candidates' names. *However, no Democratic voter could vote more than once or for more than one candidate (where only one was to be nominated).*

That which has given rise to this controversy is the undisputed fact that *all* the levers in the panel marked "C" were permitted to remain unlocked and susceptible of operation by the voters whereas *only* the lever in the panel marked "C" above the name of the Republican congressional candidate should have been permitted to remain unlocked.[5] *Complete responsibility for this improper condition of these voting machines must rest upon the City Board of Elections [the Board].* It is undisputed that the Democratic County Committee (the present appellant), *prior to the date of the primary election,* advised the Board of the improper condition of these machines and requested the Board to lock the levers in panel "C", except as

---

to a candidate . . . ." *No one* contends a voter could vote *both* above and adjacent to the candidate's name; it is undisputed that the set-up of the machines did not permit such dual voting.

[5] Cf. Section 1107 of the Election Code (25 P.S. §3007) which specifically provides: "No voting machine shall, upon any examination or reexamination, be approved by the Secretary of the Commonwealth, or by any examiner appointed by him, unless it shall, at the time, satisfy the following requirement: . . . (e) *It shall preclude each voter from voting for any candidate,* or upon any question, *for whom* or upon which *he is not entitled to vote,* and from voting for more persons for any office than he is entitled to vote for, and from voting for any candidate for the same office or upon any question more than once, except in districts and for offices where cumulative voting is authorized by law. (f) It shall be capable of adjustment by election officers, so as to permit each voter at a primary election to vote only for the candidates for nonpartisan nomination, if any, and for the candidates seeking nomination by the political party in which he is registered and enrolled, if he is enrolled as a member of a political party, and *so as to preclude him from voting for the candidates seeking nomination by any political party in which he is not enrolled.*" (Emphasis supplied).

to the Republican congressional candidate. The Board refused the committee's request and, as the court below sagely observed, "[t]hat was not a wise decision".[6]

After the election was held and the votes canvassed, it was then discovered that, in the thirteen wards involved in this appeal, 5624 voters had cast votes in Row C by the depression of the unlocked levers in panel "C" directly *below* the names of the Democratic candidates for the U. S. Senate listed in Row B.[7] The Board, inter alia, refused to count and credit such votes. An appeal was taken by the committee to the Court of Common Pleas of Philadelphia County and that court upheld the action of the Board. From that order, the present appeal was taken.

The rationale of the court below, adopted in large part by the majority opinion, was: (a) that the failure of the voters to indicate their choice in accordance with the election statute rendered void their votes; (b) in reliance on *Contested Election of Flynn,* 181 Pa. 457, 37 A. 523, that "neither our courts nor our election officers are permitted to surmise the intention of the voters, and '[that] an elector's non-compliance with proper voting procedure is inexcusable"; (c) that the depression of a lever above a blank space on Row C constituted an inexcusable noncompliance with statutorily-required voting procedure on the part

---

[6] Counsel for Miss Blatt (the appellee) contends the Committee should have applied for relief to the courts and that, not having done so, the Committee cannot now be heard to complain. Appellee fails to take into account that she had equal opportunity to act and did not do so. If any fault is to be imputed to the Committee in this respect, appellee must share in it.

[7] The majority opinion seeks to minimize the result of its ruling by stating that the "number of questioned votes" was "less than 12 to a division and less than 7 to each voting machine used in the 13 wards". What the majority opinion fails to state is that there were 908 voting machines and 512 election districts in the 13 wards involved in this appeal.

of the voters;[8] (d) that the attempted vote in a blank space on Row C constituted a nullity.

At the outset, reference must be made to the respective positions taken by the Committee and appellee. The Committee contends: (1) that the intent of the voters, if it can be ascertained, should control, that it is to be presumed that a vote is validly cast and that the disfranchisement of voters should not be permitted because of minor irregularities or technical violations of the election procedures; (2) that the intent of the voters who depressed the levers in panel "C" is clear, i.e., to vote for the particular candidates whose names appeared directly *above* the levers; (3) that, in ascertaining the intent of the voters, consideration must be given to the fact that the voting took place on complicated voting machines upon which, through the election officials' inaction, a condition had been permitted to exist whereby the voters could depress either the levers in panel "B" or panel "C", and, under such circumstances, courts and canvassing boards should exercise great liberality in determining the validity of votes cast in Row C; (4) in the absence of evidence to the contrary and in view of the presumption that voters vote legally, the votes cast by the depression of the levers in panel "C" must be regarded as having been cast by Democratic voters rather than by "crossover" Republican and Non-Partisan voters. Appellee takes the position: (1) that the votes recorded in Row C are void because they were not recorded in the proper voting space; (2) that the case law, cited by the Committee, is inapposite because such case law dealt with votes cast in the proper voting space whereas in the case at bar the votes were cast in an improper space; (3) that the depression of the levers on the

---

[8] The court below, significantly, failed to note that the lever which the voters depressed was directly *below* the name of a Democratic candidate.

blank spaces in Row C constituted an "inexcusable non-compliance" with proper voting procedures; (4) that the record indicates "cross-over" voting by Republican and Non-Partisan voters whose votes cannot be segregated from votes cast by Democratic voters and, therefore, all the votes cast in Row C must be declared void.

Certain matters are beyond question. First, there is neither allegation nor proof of any fraud on the part of the voters, the election officials, or anyone else. Second, this controversy would not be before us were it not for the impact of the validity of these votes on the contest for the Democratic nomination for the U. S. Senate.[9] Third, a proper setup of the voting machines would have insured that the levers in panel "C" were locked and placed in a condition wherein they could not have been depressed[10] and the sole responsibility for this improper setup of the machine rests with the Board. Fourth, the votes recorded in Row C were made by voters who depressed the levers in panel "C". Fifth, the total number of votes in Rows B and C in the Democratic senatorial contest was considerably less than the total number of Democratic voters who entered the voting booths, i.e., those voters who signed the requisite affidavits and voted. Lastly, an examination of the face of the voting machines, with particular reference to the ballot label wherein the names of the Democratic senatorial candidates appeared, in-

---

[9] 5624 votes were cast in Row C by the depression of levers in panel "C" *below* the names of the three candidates for the Democratic nomination for the U. S. Senate. Of such votes cast, a tabulation shows: 2094 for Genevieve Blatt, 181 for David Roberts and 3349 for Michael Musmanno. It is highly significant that, throughout all the voting districts involved in this appeal, there was a *definite pattern* of voters utilizing the levers in panel "C" to cast their votes.

[10] Except, of course, the lever above the name of the Republican congressional candidate.

dicates that the upper levers—those in panel "B"—
and the lower levers—those in panel "C"—were equi-
distant vertically from the names of the respective can-
didates and in exact juxtaposition horizontally to such
names.

Initially, we must inquire whether the operation by
the voters of the levers in panel "C", *directly below*
the candidates' names, violated the election statute and
to that end we must examine the election statute to
ascertain *how* a voter must vote on a voting machine.

Section 1216 of the Election Code[11] purports to an-
swer that question, its heading being "Instructions of
voters and manner of voting in districts in which vot-
ing machines are used." Section 1216(a) provides for
the instruction of electors by the election officials
"with the aid of the diagrams authorized by [the] act
and the mechanically operated model."[12] Section
1216(d) provides the *manner* of voting on a voting
machine at a primary election: "At primaries, he [the
voter] shall vote for each candidate individually by
operating the key, handle, pointer or knob, *upon or
adjacent to which the name of such candidate is
placed.*" (Emphasis supplied). In construing §1216(d),
we must recall that which this Court said in *Inde-
pendence Party Nomination,* 208 Pa. 108, 112, 57 A.
344: "The constitution confers the right of suffrage on
every citizen possessing the qualifications named in
that instrument. It is an individual right and each
elector is entitled to express his own individual will
in his own way. His right cannot be denied, qualified
or restricted, and is only subject to such regulation as

---

[11] Act of June 3, 1937, P. L. 1333, §1216, 25 P.S. §3056.

[12] In the case at bar, small demonstration machines were fur-
nished to the voting places but such machines did not contain
Rows C and D. The voting machines themselves contained no in-
structions and the sample ballots only added to the confusion, see,
infra.

to the manner of exercise, as is necessary for the peaceable and orderly exercise of the same right in other electors. The constitution itself regulates the times and in a general way the method, to wit: by ballot, with certain specified directions as to receiving and recording it. Beyond this the legislature has the power to regulate the details of place, time, manner, etc., in the general interest for the due and orderly exercise of the franchise by all electors alike. Legislative regulation has been sustained on this ground alone: [citing a case]. Anything beyond this is not regulation but unconstitutional restriction. It is never to be overlooked therefore that the requirement of the use of an official ballot is a questionable exercise of legislative power and even in the most favorable view treads closely on the border of a void interference with the individual elector. *Every doubt, therefore, in the construction of the statute must be resolved in favor of the elector"*. (Emphasis supplied).

The approach to a construction of §1216(d) of the Election Code must begin with an examination of our statutory law, past and present, prescribing the manner in which an elector must cast his vote for a candidate whose name appears on the ballot. It must be noted, of course, that until the passage of the Voting Machine Law of 1929 (Act of April 18, 1929, P. L. 549), all voting was by paper ballot and, therefore, the pre-1929 statutory law referred only to voting by such method.

Section 14 of the Act of 1893 (Act of June 10, 1893, P. L. 419) provided, inter alia, that the ballot should "be so printed as to give to each voter a clear opportunity to designate his choice of candidates by a cross-mark (x) *in a square of sufficient size at the right of the name of each candidate and inside the line enclosing the column"* (emphasis supplied), and §22 of that act provided, inter alia, that the voter should prepare

his ballot by placing "a cross (x) . . . *opposite the name* of the candidate of his choice for each other office to be filled, according to the number of persons to be voted for by him for each office, . . . ." (Emphasis supplied.). This act *clearly* indicated *how* and *where* on the ballot the voter must cast his vote, i.e., the voter was required to place a cross (x) in a square to the right of and opposite the name of the candidate of his choice.[13]

Sections 14 and 22 of the 1893 statute were amended by the Act of 1903 (Act of April 29, 1903, P. L. 338).[14] However, that statute, insofar as presently pertinent, did not change the manner of casting a vote as required by the 1893 statute.[15]

In 1919, the legislature again amended §22 of the 1893 statute: Act of July 9, 1919, P. L. 829.[16] As this

---

[13] Construing this statute, this Court held that a *strict* compliance was required to validate a vote: *Contested Election of Flynn*, 181 Pa. 457, 37 A. 523 (where on one ballot a "1" rather than an "x" was placed, on another ballot an "x" was placed to the right of the candidate's name but not in the square opposite the candidate's name and on a third ballot where a "1" rather than an "x" was placed in the square opposite the name of the candidate and an "x" placed to the right of the name but not in the square opposite the name and all three ballots were held void). See also: *McCowin's Appeal*, 165 Pa. 233, 30 A. 955; *Redman's Election*, 173 Pa. 59, 33 A. 703; *Newberry Township Election*, 187 Pa. 297, 40 A. 822. Cf. *Gulick Appeal*, 192 Pa. 446, 43 A. 972.

[14] The 1903 statute used the words "voter may", instead of "voter shall", but this Court held that such change of language was immaterial: *Dailey's Appeal*, 232 Pa. 540, 81 A. 655.

[15] Subsequent to the 1903 statute, this Court continued to require a literal and strict compliance with the manner of voting prescribed in the statute: *Dailey's Appeal*, supra; *Rodgers' Contested Election*, 234 Pa. 512, 83 A. 476; *Pfaff v. Bacon*, 249 Pa. 297, 95 A. 71. In *Pfaff*, it is interesting to note the language of Mr. Justice MESTREZAT, in dissent, that a "ballot cannot be rejected unless it is so marked as to make it impossible to determine the voter's choice. This is the only ground or reason for which a vote may not be counted." (p. 312).

[16] The Act of June 22, 1931, P. L. 628, further amended §§14 and 22 of the 1893 Statute but in a manner not presently pertinent.

Court said: "This amendment of 1919 was enacted to give effect more adequately to the intent of the voter; it is remedial in purpose and should be liberally construed to the end intended.": *Gegg's Election,* 281 Pa. 155, 160, 126 A. 260. So far as presently pertinent, the 1919 statute provided that a voter "may . . . make a cross-mark in the square to the right of any individual candidate whom he favors" and, where more than one candidate is to be elected to any office, "the voter shall, if he desires to divide his vote among candidates of different parties, make a cross (x) mark in the appropriate square, to the right of each candidate for whom he desires to vote . . ." The pertinent sections of the 1893 statute were finally repealed by the Election Code of 1937[17] and §1215(b) thereof now provides the manner of voting on paper ballots, i.e., that a voter, at a primary election, "shall vote for the candidates of his choice for nomination or election, . . . by making a cross (X) or check (√) mark in the square opposite the name of the candidate. . . ."

Such examination of our statutory law, past and present, on the manner of voting *by the use of paper ballots* indicates beyond question that the legislature *clearly* directed both *how* a voter should vote, i.e., originally by a cross, but now by a cross or check, and *where* such vote should be marked, i.e., in the square opposite the candidate's name, etc. Therefore, in considering our case law dealing with irregularities in the manner of voting on paper ballots, it must be kept in mind that the legislature has *always* clearly declared both *how* and *where* votes on paper ballots must be cast.

However, an examination of the legislative direction *as to the manner of voting on voting machines* reveals

---

[17] The Act of June 3, 1937, P. L. 1333, §1215, as amended by the Act of January 8, 1960, P. L. (1959) 2142, §3, 25 P.S. §3055.

an entirely different situation. In making this examination it must be noted that voting machines, whether the rows thereon be arranged vertically or horizontally, contain "ballot labels", i.e., "the cards, papers or other material, containing the names of offices and candidates . . ." (Election Code of 1937, §1101, 25 P.S. §3001), and these "ballot labels" are comparable to the squares on the paper ballots.

The Voting Machine Act of 1929, now repealed by the Election Code of 1937, was silent on the manner of voting a ballot on a voting machine. At the present time the manner of voting on voting machines is governed, insofar as primary elections are concerned, by §1216(d) of the Election Code (25 P.S. §3056) which, I repeat, provides, in pertinent part: "At primaries, he [the voter] shall vote for each candidate individually by operating the key, handle, pointer or knob,[18] upon or adjacent to which the name of such candidate is placed." That provision *clearly* states *how* the voter shall vote, i.e., by operating the lever, but does it provide with any degree of clarity *where* or *by which lever* the voter shall vote? The phrase "upon or adjacent to which the name of such candidate is placed" is clearly adjectival in nature, descriptive of the lever which the voter shall operate and limits and restricts the voter to that lever which is "upon or adjacent to" the candidate's name. The word "or" is used as a disjunctive particle that marks an alternative and differentiates between that lever which is *"upon"* and that lever which is "adjacent to".[19] The use of the word "or" together with the fact that "upon" and "adjacent" are not only not synonymous but differ

---

[18] In this opinion I have adopted the language of the parties and refer to the "key, handle, pointer or knob" as the lever.

[19] *Dilks v. Flohr Chevrolet*, 411 Pa. 425, 431, 192 A. 2d 682; *Marnell v. Mount Carmel Jt. School System*, 380 Pa. 83, 88, 110 A. 2d 357.

in meaning[20] point to a possible legislative intent that either one of two levers may be operated by the voter, i.e., that lever "upon . . . which the name of [the] candidate is placed" or that lever "adjacent to which the name of [the] candidate is placed."[21] In my opinion, the legislative description of the lever to be operated by the voter is vague, uncertain and ambiguous. From the language employed it is arguable that "upon" refers to the lever directly *above* the name of the candidate and that "adjacent" refers either to the lever *below* or the lever *above* the name of the candidate because both levers are "adjacent" to the candidate's name. This loosely and carelessly drawn piece of legislation is not only uncertain and ambiguous but confus-

---

[20] Words of a statute must be construed "according to their common . . . usage:" Statutory Construction Act of May 28, 1937, P. L. 1019, §33, 46 P.S. §533; *Breslow v. Baldwin Township School District*, 408 Pa. 121, 182 A. 2d 501. In *Commonwealth v. Lanzetti*, 97 Pa. Superior Ct. 126, 128, it was said: ". . . we are not justified in going so far as to hold that the word 'upon' is to be construed as 'adjacent'." "Upon" has been defined as "upward so as to be on", "on or upon one", "on the surface": Webster's New International Dictionary (2d Ed.), p. 2800. "Adjacent" has been defined as "Lying near or close to; sometimes, contiguous; neighboring. . . . it implies that the two objects are not widely separated, though they may not actually touch": Black's Law Dictionary. "Adjacent" has been construed in the courts: *Allentown v. Wagner*, 27 Pa. Superior Ct. 485, 493 ("implies nearness to but not necessarily actual contact") ; *Camp Hill Borough*, 142 Pa. 511, 517, 21 A. 978 ("adjoining or contiguous") ; *Hanifen v. Armitage*, 117 F. 845 ("lying near, close, or contiguous, but not actually touching").

[21] The majority opinion says the statute is "both clear and realistic" and that the "word 'upon' clearly covers, and, . . ., applies to the present Jamestown machine; the word 'adjacent' would cover and apply to a different machine known as the Shoup machine . . . ." Such construction is completely unsupported by *any* evidence whatsoever. When the election statute was enacted were there Jamestown and Shoup machines? If there were, did the legislature have knowledge of such fact? This is a startling example of statutory construction by judicial wishful thinking.

ing. At best, the legislative direction in §1216(d) is doubtful and, in such event, the statute must be construed in the manner most favorable to the voter: *Independence Party Nomination,* supra. In view of the uncertain and dubious language of the statute, how can we now hold that the operation of the lower levers in panel "C", even though such operation recorded the votes in the blank spaces on Row C, constituted a *clear* violation of, or a *clear* noncompliance with, the language of §1216(d) of the Election Code so as to justify the disfranchisement of upwards of 5000 voters?

Moreover, even the most cursory comparison of the several statutes, past and present, prescribing the manner of voting on paper ballots with the statutory provision prescribing the manner of voting on voting machines reveals that the case law on paper ballots and irregularities in voting thereon cannot be considered as precedents in determining the manner of voting on voting machines and irregularities in such voting.[22]

However, assuming, arguendo, that the operation of the levers in panel "C" was a technical noncompliance with §1216(d) and assuming that the intent of those who so operated the levers can be ascertained, does the fact of such technical noncompliance with the statute per se invalidate these votes? The court below and the majority of this Court equate noncompliance with the election statute with invalidity of the votes, *regardless of the intent of the voters*; in so doing, in my opinion, they err.

---

[22] *Pfaff v. Bacon,* 249 Pa. 297, 95 A. 71; *Rodgers' Contested Election,* 234 Pa. 512, 83 A. 476; *Dailey's Appeal,* 232 Pa. 540, 81 A. 655; *Gulick Appeal,* 192 Pa. 446, 43 A. 972; *Newberry Township Election,* 187 Pa. 297, 40 A. 822; *Contested Election of Flynn,* 181 Pa. 457, 37 A. 523; *McCowin's Appeal,* 165 Pa. 233, 30 A. 955; *Lawlor's Contested Election,* 180 Pa. 566, 37 A. 92; *Redman's Election,* 173 Pa. 59, 33 A. 703, relied on by the majority, all dealt with voting by paper ballots and, in no sense, control the case at bar.

From 1893 until the passage of the 1919 statute our courts did maintain a rigid and unbending rule which, in effect, rendered invalid any votes cast which were not in strict and literal compliance with the statute, regardless of whether the intent of the voter could be ascertained from the ballot: *McCowin's Appeal, supra; Redman's Election, supra; Contested Election of Flynn, supra; Newberry Township Election, supra; Dailey's Appeal, supra; Rodgers' Contested Election,*[23] *supra.* The rigidity of such a rule is particularly difficult to understand since §27 of the 1903 statute, at least impliedly, granted recognition and consideration to the ascertainment of the voter's intent.[24]

However, since the passage of the 1919 statute this Court properly has been more liberal and has given recognition and weight to the intent of the voter, once ascertained. In *Knight v. Coudersport Borough,* 246 Pa. 284, 289, 92 A. 299, we approved that which was said in Black on Interpretation of Laws: "If the law itself declares a specified irregularity to be fatal, the courts will follow that command, irrespective of their views of the importance of the requirement. In the absence of such declaration, the judiciary endeavor, as best they may, to discern whether the deviation from the prescribed forms of law had or had not so vital an influence on the proceedings as probably prevented a free and full expression of the popular will. If it had, the irregularity is held to vitiate the entire return; otherwise, it is considered immaterial." See also: *Fish's Election,* 273 Pa. 410, 117 A. 85; *Gegg's Election,* su-

---

[23] In *Rodgers,* this Court, even though it conceded that the court below had ascertained the voter's intent, refused to accord any weight to such intent.        ,

[24] Inter alia, §27 provided: "If a voter has marked his ballot otherwise than as directed by this act, so that for any reason it is impossible to determine the voter's choice for any office to be filled, his ballot shall not be counted for such office; . . . .".

pra. The attitude of our Court in this area of the law, in recent times, has been well epitomized in *Norwood Election Contest Case,* 382 Pa. 547, 552, 116 A. 2d 552: "Every rationalization within the realm of common sense should aim at saving the ballot rather than voiding it." In *McCracken Appeal,* 370 Pa. 562, 566, 88 A. 2d 787, we said: "In any disputed election, nothing can be more vital towards the accomplishment of an honest and just selection than the ascertainment of the intention of the voter." See also: *James Appeal,* 377 Pa. 405, 408, 105 A. 2d 64; *Reading Election Recount Case,* 410 Pa. 62, 66, 188 A. 2d 254. If, from the ballot cast, the intent of the voter in his choice of a candidate for office can be ascertained, then such ascertained intent must be granted full recognition and the ballot counted, even though there be a technical noncompliance with the election statute. See: *Arnold Borough Contested Election,* 307 Pa. 536, 161 A. 536.[25]

What was the intent of the voters who operated the levers in panel "C"? In my opinion, such intent was to vote for the Democratic senatorial candidates whose names appeared *directly above* the levers operated. When a voter depressed the lever in panel "C" *directly below* the name of Genevieve Blatt, he intended to vote for Miss Blatt; likewise, as to those voters who depressed the levers *directly under or below* the names of David Roberts and Michael Musmanno. In *Peck v. Lackawanna County Board of Elections,* 44 Lack. Jurist, 97, Judge (now Mr. Justice) EAGEN fully recognized that such was the intent on the part of voters pulling a lever *under* the name of a candidate. As a

---

[25] Such is the rule in other jurisdictions: *Green v. Independent Consolidated School District,* 252 Minn. 36, 89 N.W. 2d 12; *Redfearn v. Board of State Canvassers,* 234 S.C. 113, 107 S.E. 2d 10; *Hall v. Barton,* 290 Mass. 476, 195 N.E. 753; *Turner v. Board of Education,* Ky., 266 S.W. 2d 321; *Matter of Creedon,* 264 N.Y. 40; *Thompson v. Boling,* 240 Ky. 340, 42 S.W. 2d 321.

matter of fact, the court in *Application of Lester,* 127 N.Y.S. 2d 272, so heavily relied on by appellee, conceded that "practical experience has demonstrated that there may be much force in [the] argument" that those who cast their votes in Row C of a voting machine do so in error by pulling the lever *below* rather than that *above* the candidate's name, at the time intending to vote for such candidate.

The majority opinion, labeling the finding of the voters' intent as a "guess", concludes that such a "guess" as to intent, if permitted to stand, would occasion dire results perhaps even "chaos" in government. With that I thoroughly disagree. In many areas of the law courts must and do ascertain, from language and/or conduct, the intent of an individual. As an example, time and again we have said that, in the construction of wills, the "polestar" is the intent of the testator and we then have proceeded, by placing ourselves in the "armchair" of the testator and by examining the language and scheme of his will and the surrounding circumstances, to ascertain what the testator intended : *Woodward Estate,* 407 Pa. 638, 640, 182 A. 2d 732. Was such intent arrived at by "guess", speculation or conjecture? I think not. In the case at bar, believing as I do that in election cases we must give recognition to the intent of a voter if ascertained, why cannot we place ourselves in the position of a voter in the polling booth, examine what confronted him and what he did and, considering all the surrounding circumstances, ascertain his intent? Granted that in construing a will we have principally the language of the testator before us and we determine what he meant by what he said, it seems to me that we can just as well determine what a voter meant by what he did; conduct can be just as eloquently communicative of intent as the written word. The ascertainment of the voters' intent is not a "guess"; it is an opinion arrived at after a careful

marshalling of all the data necessary to the formulation of such opinion.

If the voters by depressing the levers did not intend thereby to vote for the candidates whose names appeared *directly above* such levers, what did they intend? The majority opinion offers several alternatives, i.e., such votes were "protest" votes, "cross-over" votes or "mistake votes". If there were "protest" votes, against whom or what was the protest? On this subject the record is silent and the majority opinion furnishes no support for its suggestion. Were these "cross-over" votes? Appellee contends that Republican and Non-Partisan voters "crossed over" and registered their votes for Democratic candidates. In support of this contention, appellee points out that the levers in panel "C" were unlocked to Republican and Non-Partisan voters as well as Democratic voters, that on 17 voting machines used only by non-Democratic voters a total of 60 votes appeared in the senatorial columns of Row C and that, by a projection of the ratio shown on those machines to all the machines in the thirteen wards, the conclusion must be reached that approximately 1378 of the 5624 votes in Row C were cast by Republican or Non-Partisan voters.[26] In this connection, it must be noted that the total number of votes cast in Rows B and C were less than the total number of Democratic voters who actually voted. If appellee's contention is sound, then over 1300 Republican or Non-Partisan voters directly violated the election laws by participating in a Democratic party pri-

---

[26] This is sheer speculation. There was no evidence that 17 voting machines were used only by Non-Democratic voters. This was a presumption indulged in by the appellee and unfortunately accepted by the majority. Courts "cannot act on conjecture." (*Matter of Creedon*, 264 N.Y. 40). It could well be that the 60 votes (about 3 to a machine) were cast by voters, who, like the rest of the 5624 voters, voted beneath the name of the candidate instead of above the name.

mary. Such a contention, unsupported as it is by any proof, falls in the face of the presumption long adhered to by this Court that, when a person acts, it is to be presumed that he acts in compliance with, not in violation of, the law: *Simon Election Case,* 353 Pa. 514, 521, 46 A. 2d 243. To paraphrase the language of Chief Justice MAXEY in *Simon,* supra, illegality cannot be proved by merely showing illegality-facilitating circumstances. What appellee—and now the majority of this Court—urges is that it is *possible* that there were "cross-over" votes cast in Row C; I would remind appellee and the majority of this Court that we said in *Winograd v. Coombs,* 342 Pa. 268, 271, 20 A. 2d 315: "Judicial decrees cannot be founded on possibilities". Were these "mistake" votes? On this there is absolutely no evidence whatsoever, and I will not classify, simply by rote, the 5000 odd votes cast in this manner as "mistakes" and reject them out of hand. If any conclusion is a pure "guess", it is the majority's conclusion that the votes in Row C were in "protest" or "cross-over" or by way of "mistake". The fallacy of the majority's position in this respect is self-evident: its complete rejection of the factual data on this record. What is even more astounding is the clear implication in the majority opinion that, even if the voters' intent were ascertained, such intent would not be recognized because voters, in the manner of their voting, failed to comply with the letter of the election statute!!

Moreover, we cannot, and must not, overlook the fact that it was the carelessness on the part of the Board in permitting the levers in panel "C" to remain unlocked and susceptible of operation which created the condition on the basis of which we are now asked to invalidate these 5624 votes. Over eighty years ago, this Court in *Contested Election of Wheelock,* 82 Pa. 297, 299, said: "If we, by our decision, should permit

the carelessness . . . of [election] officers . . . to defeat the election . . ., we would thus make the people suffer for an act in which they did not participate, and which they did not sanction." More recently, we arrived at the same result in *Simon*, supra.

Appellee asks this Court to invalidate the 5624 votes cast in Row C in the Democratic senatorial contest as well as all the other votes cast in Row C for other candidates. In so doing, reliance is placed principally on *Flynn*, supra, *Weber Appeal*, 399 Pa. 37, 159 A. 2d 901, and *Application of Lester*, 127 N.Y.S. 2d 272. Factually, both *Flynn* and *Weber* completely differ from the case at bar and are, therefore, inapposite. Moreover, *Flynn* dealt with statutory provisions applicable to paper ballots, not voting machines, and *Flynn* represents a rule of extreme rigidity no longer followed by this Court. Even if *Lester* had been determined under statutory provisions similar to the statutory provisions as to voting-machine voting in Pennsylvania—which it was not—, even so I am neither bound by *Lester* nor impressed by its rationale.

Great emphasis is placed by the majority on the specimen ballots which, in the majority view, contained "clearly worded instructions" and a "crystally clear illustration" on the manner of voting, instructions *allegedly ignored* by the voters. The printing and delivery of specimen ballots is covered by the Election Code (§1007) but it is significant that when the legislature provided the instructions to be given by election officers to voters on voting machines, specimen ballots were not mentioned (Election Code, §1216(a), (b)). To say, as does the majority, that the voters *ignored* the specimen ballots clearly implies that the voters *saw* these ballots but there is no evidence such ballots either were seen by, or available to, the voters. As a matter of fact, even the legislature did not contemplate that each voter receive a specimen ballot because it re-

quired delivery of specimen ballots to the election officers, only in the ratio of one specimen ballot for each five official ballots. Moreover, specimen ballots "are supposed to be like the [official ballots] in every essential particular" (*Knight v. Coudersport Borough,* 246 Pa. 284, 288, 92 A. 299) and the specimen ballots in the wards involved in this appeal were not "like the official ballots". On the specimen ballot, the levers are shown in the ballot labels wherein appeared the candidates' names; on the machine the levers were outside the ballot labels. On the specimen ballot, in the Democratic column and *below* the word "Democratic", was the letter "B" followed by a pointing hand which did not point to any row of levers; on the voting machines, the letter "B" is *above* the word "Democratic" and the pointing hand points to the levers in panel "B". A comparison of the specimen ballot and the face of the voting machine readily indicates the nonconformity of the former with the latter.

The majority takes refuge in the statement that the machines were "clear to every one". The weakness of this statement is well illustrated by an incident which took place in the hearing in the court below when the very intelligent counsel for the Board, requested by the court to point out the levers in panel "C", depressed the levers in panel "D". This incident emphasizes, if any emphasis be needed, the complexity and intricacy of the voting machines which confused these voters.

The power to throw out ballots should be exercised very sparingly and only for "compelling reasons" (*Bauman Election Contest Case,* 351 Pa. 451, 454, 41 A. 2d 630) and " ' " the rights of voters are not to be prejudiced by the errors or wrongful acts of election officers" ' " (*Wilkes-Barre Election Contest,* 400 Pa. 507, 513, 162 A. 2d 363).

In summary, I am of the opinion that: (1) §1216-(d)—which establishes the guideline for voting on vot-

ing machines at primary elections—does not, *although it should,* proscribe the depression of a lever *below* the name of a candidate; (2) under the language of the carelessly drafted §1216(d), at best, it is doubtful that the depression of a lever below the name of a candidate violates §1216(d) and any doubt in the construction of the statute must be resolved in favor of the voter; (3) even if the manner of voting in the case at bar be considered a violation of §1216(d), the violation was of such nature, that, if the voters' intent can be ascertained, such intent should govern; (4) it is clear beyond question that the voters, depressing the levers in panel "C", *intended* thereby to vote for the candidate whose names were *above* such levers; (5) the suggestion in the majority opinion that the votes recorded in Row C were "protest", "cross-over" or "mistake" votes is based on conjecture and not upon proof of the quality upon which a judicial decree can be predicated; (6) even though the operation of the levers in panel "C" violated §1216(d), the intent of the voters being evident, there is no "compelling reason" to justify the invalidation of the votes and disfranchise thousands of well-intentioned voters.[27]

Lastly, I am reminded that in *Simon Election Case,* 353 Pa. 514, 519, 46 A. 2d 243, we said: "The courts have never been able to lay down a precise standard by which it can be determined in a given case whether the irregularities [on the part of the officials conducting an election and making the electoral count] are of sufficient magnitude to justify the rejection of an

---

[27] It is interesting to note the perspective of the appellee, the court below and the majority of this Court which is directed to and concentrated on the fact that the questioned votes were cast in "blank spaces". Such perspective overlooks completely the fact that the thrust of §1216(d) is directed to the operation of the levers, not to the place of recordation of the votes. The criterion by which the validity of the votes cast must be determined is *exclusively* that furnished by the statute.

entire poll in any district in which the question arises. The facts in each case must be considered and a determination reached as to whether justice is more likely to be done by counting the votes, despite the irregularities, or by refusing to count them because of the irregularities." Under the facts as presented on this record, I am convinced that "justice is more likely to be done by counting the votes" than "by refusing to count them".

The right to vote for United States Senator is protected and guaranteed by the Constitution of the United States (Art. I, §§2 and 3; 17th Amendment). The right to vote obviously carries with it the right to have one's vote counted. In *U. S. v. Classic,* 313 U. S. 299, 314-16, 61 S. Ct. 1031, 85 L. Ed. 1368, the U. S. Supreme Court has recognized as a right "secured by the Constitution" the right of voters *"to cast their ballots and have them counted".* As a result of the majority view thousands of voters have been denied this constitutional right. The Supreme Court of the United States in *Gray v. Sanders,* 372 U.S. 368, 380, 9 L. Ed. 2d 821, 830, declared " ' the right to have one's vote counted' has the same dignity as 'the right to put a ballot in a box.' " See also: *Wesberry v. Sanders,* 376 U. S. 1, 11 L. Ed. 2d 481, 486. A study of the majority opinion does not reveal any sound, let alone *compelling,* reason for the denial of this right.

The record in this case and our applicable law, statutory and decisional, compel me to recognize the intent of the voters. I cannot in good conscience on the facts of this case be a party to the disfranchisement and denial of the constitutional right of these thousands of voters. In my opinion, these voters should be validated; right and justice command that result. I would reverse the order of the court below.

Mr. Justice O'BRIEN joins in this dissenting opinion.